[No. A048324. First Dist., Div. Two. May 8, 1991.]

In re the Marriage of AVA and CARL ANDREW GAYDEN.
DARCEL MARLENE STOCKEY, Respondent, v.
CARL ANDREW GAYDEN, Appellant.

COUNSEL

James B. Wickersham and Maurya M. Picano for Appellant.

Eugenia MacGowan for Respondent.

OPINION

**KLINE, P. J.**—This is an appeal from an order awarding visitation rights with a minor child to a biologically unrelated person over the objections of both parents.

On August 27, 1986, appellant, Carl Andrew Gayden, petitioned the Alameda County Superior Court for the dissolution of his marriage to Ava Gayden. On February 22, 1988, after dissolving the marriage, the court granted appellant legal and physical custody of the couple's child, Jennifer, who was then two years old. Appellant's wife was granted visitation rights every other weekend.

In 1989, Darcel Marlene Stockey, appellant's former girlfriend, moved to be joined as a party (Cal. Rules of Court, rule 1252 (b)), claiming she too was entitled to visitation rights as a "de facto parent" of Jennifer. Permitting joinder, the trial court asked family court services for a report and recommendation regarding the request and invited the parties to submit additional evidence.

For the most part, the evidence submitted by the parties was in the form of declarations. Ms. Stockey declared that she lived with Jennifer and appellant from the time the child was seven months old until she was approxi-

mately one year and nine months old. She thereafter continued to see the child frequently until the child was about three and a half years old, when Ms. Stockey and appellant ended their relationship. Ms. Stockey declared that during the period she cohabited with appellant "Jennifer was reared as though she lived in a traditional two-parent family." According to Ms. Stockey, Mrs. Gayden "abdicated her right and responsibility to be a mother to Jennifer consistently since Jennifer was seven months of age. I stepped into the void created by the absence of a maternal parent. Jennifer was so young at the time of [Mrs. Gayden's] abandonment that Jennifer has known no other mother but me."

Appellant's declarations paint a somewhat different picture. Acknowledging that he and Ms. Stockey "had an on-again, off-again, boyfriend/girlfriend relationship" for about two years and lived together for six months, appellant emphasized that the relationship ended more than a year before Ms. Stockey sought visitation, that Jennifer always lived with him and only "occasionally" stayed overnight with Ms. Stockey, and that such visitations ended months earlier. After he ended his relationship with Ms. Stockey, appellant "observed a positive change in the minor child's attitude toward her natural mother." Declaring that he and his former wife "have made substantial strides in working out our differences concerning custody and visitation," appellant opined that Ms. Stockey's continued involvement with Jennifer "could only be detrimental to the minor child and the ongoing relationship between [the] child and her parents."

In her declaration, Mrs. Gayden claimed Ms. Stockey had falsely told others she was Jennifer's natural mother and that "neither Carl nor myself were fit to be Jennifer's parents." Mrs. Gayden believes Ms. Stockey has "an unhealthy emotional attachment to Jennifer," with whom she is assertedly "obsessed." Mrs. Gayden is "adamantly opposed to Marlene's having any amount of visitation with Jennifer" because "Marlene's irrational hostility toward me has caused her to undermine my relationship with my daughter and I am given no indications that this would not continue if visitations were allowed."

The report of Barbara Cushing, the family court counselor, confirmed that "there is a great deal of bitterness and hostility" between Ms. Stockey and Jennifer's mother which is "clearly rooted in their differing views of Jennifer's needs." The report states that, "[d]espite Ava's unwillingness to have Marlene be included in Jennifer's life on a regular basis, she is willing to let Marlene see Jennifer for the purpose of putting closure on the relationship and to protect Jennifer from feelings of abandonment by Marlene." According to the report, appellant is willing to let Ms. Stockey see Jennifer

only if the visit were in the office of Dr. Gerald Davenport, a psychologist the child had been seeing.

The family court counselor felt Ms. Stockey loved Jennifer and was deeply concerned about her education and development. Although the counselor did not believe Ms. Stockey's relationship with Jennifer, "in itself," was harmful to the child, she concluded that "if Ms. Stockey's continuing presence in Jennifer's life occurs in an atmosphere of bitterness, hostility and resentment, then Jennifer would suffer harmful effects. At this time, I see no spirit of cooperation in Mr. Carl Gayden with respect to facilitating Jennifer's relationship with Ms. Stockey. As for Ava Gayden, I think she perceives Ms. Stockey as a threat to her own relationship with Jennifer and as such she cannot be supportive of Jennifer's relationship with Marlene." The counselor felt the court was confronted with "a balancing question: do the benefits to Jennifer of ongoing contact with Marlene Stockey outweigh the detrimental effects of a very likely ongoing battle between Mr. and Mrs. Gayden and Ms. Stockey." The counselor declined to make a specific recommendation in her report.

In a letter reviewed by the court, the child's psychologist, Dr. Davenport, stated that "Jennifer does not talk about Ms. Stockey with me nor does Jennifer reflect any emotional loss in her play therapy. Additionally, since the biological parents are so opposed to Ms. Stockey having any relationship with Jennifer, I do not feel visitation with Ms. Stockey would be in Jennifer's best interest."

On December 18, 1989, after considering the declarations of the parties, the report of the family court counselor, the views of Dr. Davenport and the arguments of counsel, the trial court granted Marlene Stockey unsupervised visitation rights with Jennifer between the hours of 10 a.m. and 2 p.m. on the first Saturday of each month. The court reasoned as follows: "What harm is done allowing a four-hour visit between a little girl and someone [with whom] she had a relationship? We're not doing anything that will create a terrible problem. . . . [Ms. Stockey] knows at this point that she's going to be having a very subsidiary role in the development of this child and if she spent this little time that she has attempting to engender hate in this child regarding the parents who are going to have the primary role with this child, she would be doing a really cruel and terrible thing; . . . I don't think that's true at this point."

On January 2, 1990 the husband's request to stay the order was denied. He filed a notice of appeal on January 4. The next day he petitioned this

court for a writ of supersedeas staying the visitation order. On January 24 we granted the writ and stayed the order.

*Discussion*

■ ■ ■ ■ The trial court awarded visitation rights to Marlene Stockey pursuant to Civil Code section 4601,[1] which confers upon the superior court the discretion to grant reasonable visitation rights "to any other person [than a parent] having an interest in the welfare of the child."[2]

■ In assessing the propriety of the award we must, of course, indulge all intendments in favor of the ruling. Additionally, we must assume the trial court made whatever findings are necessary to sustain the judgment. (*Michael U.* v. *Jamie B.* (1985) 39 Cal.3d 787, 792-793 [218 Cal.Rptr. 39, 705 P.2d 362].) There is some doubt, however, about the nature of the findings necessary to award visitation rights to a nonparent under section 4601 over the united opposition of fit parents having custody of the minor child. ■ That is, may such an award be made upon a finding that visitation is in the best interests of the child or is there a more stringent requirement? No case explicitly addresses this question.

We look for guidance to the custody cases, which also often involve competing claims of biologic parents and others asserting an interest in the child. *In re Baby Girl M.* (1984) 37 Cal.3d 65 [207 Cal.Rptr. 309, 688 P.2d 918] and *In re B.G.* (1974) 11 Cal.3d 679 [114 Cal.Rptr. 444, 523 P.2d 244], which are seminal cases interpreting the provisions of the Family Law Act of 1969 relating to custody (§ 4600 et seq.), establish that in that context there is a strong legislative preference for the rights of parents over those of nonparents. "As between parents, [section 4600] permits the court to award custody 'according to the best interests of the child,' but in a dispute between a parent and a nonparent, the section imposes the additional stipulation that an award to the nonparent requires a finding that 'an award of custody to the parent would be detrimental to the child.'" (*In re B.G., supra,* at p. 698.) Though visitation differs from custody in several important ways, the parental preference warrants indulgence in this context as

---

[1] All statutory references are to the Civil Code.

[2] Appellant suggests the trial court was unauthorized to entertain the visitation request because section 4601 only applies in cases in which custody is not just nominally "at issue" but actually contested. There is no authority for this proposition. *White* v. *Jacobs* (1988) 198 Cal.App.3d 122 [243 Cal.Rptr. 597], which appellant relies upon, held that a court cannot entertain an *independent* action to order visitation of a nonparent over the objections of the parents; that principle does not bar joinder of a nonparent seeking visitation where, as in this case, the issue of custody or visitation is properly before the court, regardless whether there is an actual custody or visitation dispute as between the parents. (See *Perry* v. *Superior Court* (1980) 108 Cal.App.3d 480, 482 [166 Cal.Rptr. 583]; Cal. Rules of Court, rule 1252 (b).)

well. Not only is visitation a limited form of custody during the time the visitation rights are being exercised (*Perry* v. *Superior Court, supra,* 108 Cal.App.3d 480, 483), but judicially compelled visitation against the wishes of both parents can significantly affect parental authority and the strength of the family unit. In any case, as has recently been pointed out, "there is no statutory or decisional authority to grant [a nonparent] rights of custody and/or visitation *over the objections* of the child's natural parent." (*Curiale* v. *Reagan* (1990) 222 Cal.App.3d 1597, 1600 [272 Cal.Rptr. 520], italics in original.)

Providing parents a superior ability to influence the upbringing of their child is clearly in the interests of the child. By diminishing the likelihood of struggle between parents and others close to the child with whom the parents are at cross-purposes, the parental preference minimizes the likelihood the child will be exposed to hostility between those with whom he or she has a strong attachment, which can cause distress, create loyalty dilemmas and be disruptive of the child's socialization experiences. (Emery, Marriage, Divorce and Children (1988) at pp. 94-98, and other authorities there cited and discussed.) Recent empirical studies suggest that in many instances sustained exposure to ongoing conflict may cause children more psychological distress and adjustment difficulties than separation from an attachment figure involved in the conflict. (See Johnston et al., *On-Going PostDivorce Conflict: Effects on Children of Joint Custody and Frequent Access,* 59 Am.J. of Orthopsychiatry 576 (1989).)[3] Deference to parental autonomy not only minimizes conflict with others outside the immediate family, but encourages the development of a stronger and more reliable relationship between parent and child. "A child develops best if he can have complete trust that the adults who are responsible for him are the arbiters of his care and control as he moves toward the full independence of adulthood and gradually comes to rely upon himself as his own caretaker." (Goldstein et al., Beyond the Best Interests of the Child (1979) at pp. 117-118.)

Applying the doctrine of parental preference, courts have long been loath to interfere with "the natural liberty of parents to direct the upbringing of their children." (*Odell* v. *Lutz* (1947) 78 Cal.App.2d 104, 106 [177 P.2d 628]; *Prince* v. *Massachusetts* (1944) 321 U.S. 158, 166 [88 L.Ed. 645, 652-

---

[3] This study, which relates to conflict between parents, discusses the research indicating "that frequent visitation is beneficial only in the absence of sustained parental hostility and where the noncustodial parent is not emotionally disturbed. [Citations.] . . . [T]here is no evidence that encouraging or mandating joint custody and frequent visitation through the legal system either diminishes hostility between those parents who are severely disputing such arrangements, or increases their cooperation in parenting their children. Moreover, there is as yet no evidence, for or against, that joint custody and frequent access when recommended by a court evaluator, or ordered by the Court in cases where there are ongoing disputes, is beneficial to the child." (*Id.,* at pp. 577-578.)

653, 64 S.Ct. 438]; *Stewart* v. *Stewart* (1953) 41 Cal.2d 447, 451-452 [260 P.2d 44]; *In re Carmaleta B.* (1978) 21 Cal.3d 482, 489, 495-496 [146 Cal.Rptr. 623, 579 P.2d 514]; *In re Marriage of Mentry* (1983) 142 Cal.App.3d 260, 267-268 [190 Cal.Rptr. 843]; *In re Marriage of Wellman* (1980) 104 Cal.App.3d 992, 996 [164 Cal.Rptr. 148]; *In re Marriage of Murga* (1980) 103 Cal.App.3d 498, 505-506 [163 Cal.Rptr. 79]; *In re Raya* (1967) 255 Cal.App.2d 260, 265 [63 Cal.Rptr. 252].) As we stated in *In re Marriage of Mentry, supra*, 142 Cal.App.3d 260, there is "a salutary judicial disinclination to interfere with family privacy without the evidentiary establishment of compelling need. [Citation.] This attitude, which has been maintained against the urgings of some commentators who favor expansion of the legal grounds for intervention and a stronger judicial role in the supervision of parents, is predicated, inter alia, on the recognition that a '. . . court cannot regulate by its processes the internal affairs of the home. . . . The vast majority of matters concerning the upbringing of children must be left to the conscience, patience, and self restraint of father and mother. No end of difficulties would arise if judges try to tell parents how to bring up their children.' [Citations.]" (*Id.*, at. pp. 266-267, fn. omitted.) Thus, we emphasized, "[t]he concept of family privacy embodies not simply a policy of minimum state intervention but also a presumption of parental autonomy." (*Id.*, at pp. 267-268, fn. omitted.) Judicial intervention is hardest to justify where, as in this case, there is no conflict between the parents, who jointly oppose what they consider to be the unwarranted intrusion of a third party.

The foregoing principles have been found to require denial of visitation to parties with a much stronger claim than Ms. Stockey. In *Adoption of Berman* (1975) 44 Cal.App.3d 687 [118 Cal.Rptr. 804], maternal grandparents of children whose mother was deceased were granted temporary guardianship of the children. After the father remarried the temporary guardianship was dismissed and the grandparents were granted reasonable visitation rights. Due to conflict between the parties, the grandparents' visitation rights were gradually reduced, and the trial court eventually entered an order vesting complete discretion as to visitation in the father and his wife, who had by then adopted the children. This court affirmed the order because we agreed that giving the parents complete control of visitation was the only practical way to shield the children from "the constant turmoil between the parties . . . described by the [trial] court as a 'battle' in which the children are the ones most likely to get hurt." (*Id.*, at p. 696.)

One of the significant aspects of *Berman* is that, because their daughter, the mother of the children, had died, the grandparents there were the beneficiaries of a statute (§ 197.5) specifically conferring visitation rights

upon the relatives of a deceased spouse.[4] Therefore, as another court has noted, by finding that in the *Berman* case grandparent visitation was not in the best interests of the child, we in effect determined that statutorily conferred visitation rights are "subordinate to the preservation of the parent/child family unit." (*In re Marriage of Jenkens* (1981) 116 Cal.App.3d 767, 774 [172 Cal.Rptr. 331].)

In 1983, eight years after our decision in *Berman*, the Legislature amended the Family Law Act to strengthen the visitation rights of grandparents.[5] These amendments shed helpful light on the legislative understanding of section 4601.

The grandparent preference is embodied in subdivisions (b) and (k) of section 4351.5. Subdivision (b) provides that the superior court has jurisdiction pursuant to section 4601 "to award reasonable visitation rights to a person who is a grandparent of a minor child of a party to the marriage, if visitation by that person is determined to be in the best interests of the minor child." Subdivision (k) created "a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interests of a minor child if the parties to the marriage agree that the grandparent should not be awarded visitation rights." (§ 4351.5, subd. (k).) The statutory right conferred upon grandparents is similar to that accorded relatives of a deceased parent under section 197.5, subdivision (a) (set forth in its entirety, *ante*, at fn. 4), which permits such persons to be awarded reasonable visitation rights simply "upon a finding that such visitation rights would be in the best interests of the minor child."

If visitation rights could be granted to any nonparent under section 4601 merely upon the finding that it is in the best interests of the child, section 4351.5, subdivision (b) and section 197.5, subdivision (a) would be meaningless; a conclusion we are obliged to resist. Moreover, if, as provided in subdivision (k) of section 4351.5, the joint opposition of the parents creates a rebuttable presumption that grandparent visitation is not in the

---

[4] Section 197.5, subdivision (a), provides that "If either the father or mother of an unmarried minor child is deceased, the children, parents, and the grandparents of such deceased person may be granted reasonable visitation rights to the minor child during its minority by the superior court upon a finding that such visitation rights would be in the best interests of the minor child."

[5] As has been noted, grandparent visitation is ordinarily beneficial to child development. "Conceptually, depriving a child from [*sic*] his or her grandparents sets the child apart from his peers and impedes rapport between 'natural' family. Unless family ties are maintained, later attempts at rekindling the family flame become awkward if not impossible." (*In re Robert D.* (1984) 151 Cal.App.3d 391, 397 [198 Cal.Rptr. 801]; see also, Cherlin & Furstenberg, The New American Grandparent (1986) and Bengston & Robertson, Grandparenthood (1985).)

best interests of the child, then the opposition of both parents ought to be given even greater weight when visitation is sought by unrelated persons not favored under the Family Law Act.

As our Supreme Court has pointed out, the Family Law Act was not intended to disturb the long-standing inclination of California courts to defer to the jointly expressed wishes of the parents except in the most unusual and extreme cases. (*In re B.G., supra,* 11 Cal.3d at p. 698.) It is established that visitation is ordinarily denied in the face of parental objection. As stated in *In re Marriage of Jenkens, supra,* 116 Cal.App.3d 767, discretionary rights of visitation for nonparents under section 4601 "must give way to the paramount right to parent if the visitation creates conflicts and problems." (*Id.,* at p. 774.)[6]

For these reasons, we hold that, except where the Legislature has otherwise specifically provided elsewhere in the Family Law Act, visitation rights regarding a minor child may not be granted to a nonparent under section 4601 over the joint opposition of parents having custody of the child merely upon a finding that such an award will promote the best interests of the child. Where the parents are unified in opposition, visitation must not be allowed unless it is clearly and convincingly shown that denial of visitation would be detrimental to the child.[7]

In the present case, the trial court exercised its discretion to award Marlene Stockey visitation rights on the basis of a finding, apparently based upon a bare preponderance of the evidence, that such visitation was in the best interests of the child. The court, which did not question the parents' fitness to raise their child, indulged no presumption that the wishes of the parents be complied with and made no finding that awarding visitation rights to Ms. Stockey was necessary to avert harm to the child. As we interpret section 4601, this reasoning was erroneous.

---

[6] In *Ronald FF. v. Cindy GG.* (1987) 70 N.Y.2d 141 [517 N.Y.S.2d 932, 511 N.E.2d 75], the highest court of New York appears to have elevated this issue to one of constitutional dimension. There, a former boyfriend of the mother of a child born out of wedlock petitioned for visitation rights. Though the results of a blood-grouping test excluded the petitioner as the biologic father, the court was aware that, during periods of estrangement from the child's mother, the "petitioner continued to see the child regularly and was held out to be and considered himself to be the child's father." (511 N.E.2d at p. 76.) Nevertheless, directing its inquiry "solely to the State's power to interfere with the right of this mother to choose those with whom her child associates," the court concluded that "[t]he State may not interfere with that fundamental right unless it shows some compelling State purpose which furthers the child's best interests (see *Stanley v. Illinois,* 405 U.S. 645, 651 . . .)." The court additionally determined that "[n]o such compelling purposes are present in this case." (*Id.,* at p. 77.)

[7] With respect to application of the clear and convincing standard of proof, see *Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407, 421-422 [188 Cal.Rptr. 781].

 Appellant urges us not to remand to the superior court but to render a final determination. We shall do so.

In *In re B.G., supra*, 11 Cal.3d 679, the trial court determined that an award of custody to foster parents was in the best interests of the child and made such an award without inquiring whether an award of custody to the mother would be detrimental to the child. Though the Supreme Court reversed the judgment, it declined to render a final custody decision. Observing that the issue of custody is ordinarily committed to the discretion of the trial court, the court stated that "[o]nly in an exceptional case, in which the record so strongly supported a party's claim to custody that a denial of that claim by the trial court would constitute an abuse of discretion may an appellate court itself decide who should be granted custody[.]" (*Id.*, at p. 699.)

Unlike *In re B.G.*, where the competing considerations were "closely balanced" (11 Cal.3d at p. 699), the record in this case provides no basis for a visitation award under the applicable legal standard. (Indeed, it is doubtful the award was proper even under the less rigorous test the trial court employed.) The report of the family counselor, which was at best equivocal, pointed out not only that "in an atmosphere of bitterness, hostility and resentment . . . Jennifer would suffer harmful effects," but conceded that the "ongoing battle" between the parents and Marlene Stockey was likely to continue.[8] Dr. Davenport, the child psychologist, declared unequivocally that visitation would not be in Jennifer's best interest, let alone necessary to avoid detriment to the child. The declarations of the parties to the dispute underscore the depth of the existing antipathies and the unlikelihood they will soon abate. The record is so manifestly inadequate to overcome the presumption of parental autonomy that we can ourselves decide, and we do determine, that visitation should not be awarded.

 We do not mean to suggest by this opinion that a court must always submit to the objection of biologic or adoptive parents to a visitation award to another person with whom their minor child has developed a close attachment. As strong as the rights of such parents must be, there may be instances in which a child would be significantly harmed by completely

---

[8] At the time of the hearing at which visitation was awarded, the family court counselor was on leave from her job due to the imminent birth of her child. The trial judge revealed at the hearing that at some unspecified time he had contacted the counselor by phone. He reported at the hearing that "It is her feeling that there should be some limited visitation with Miss Stockey at this point." The ex parte manner in which this unexplained oral emendation of the family counselor's report was sought and received by the court denied appellant essential elements of due process and was clearly improper. (*McLaughlin v. Superior Court* (1983) 140 Cal.App.3d 473 [189 Cal.Rptr. 479].)

terminating his or her relationship with a person who has (1) lived with the child for a substantial portion of the child's life; (2) been regularly involved in providing day-to-day care, nurturance and guidance for the child appropriate to the child's stage of development; and, (3) been permitted by a biologic parent to assume a parental role. The needs of the child, which are the most important consideration, may sometimes require that a visitation award be made to such a "de facto parent."[9]

Because, as earlier explained, such an award is not warranted in the present case, the order of the Alameda County Superior Court is reversed.

Benson, J., and Peterson, J., concurred.

A petition for a rehearing was denied June 4, 1991.

---

[9] The Supreme Court has defined a "de facto parent" as a "person who, on a day-to-day basis, assumes the role of parent, seeking to fulfill both the child's physical needs and his psychological need for affection and care." (*In re B.G., supra*, 11 Cal.3d at p. 692, fn. 18.)