Filed 7/26/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | H046491 (Santa Clara County Super. Ct. No. 17JD024630) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. M.D., Defendant and Appellant. | |

M.D. (mother) appeals from the juvenile court's order granting her ex-boyfriend (Albert) visitation with her son, J.P. Mother argues that the juvenile court did not have the authority to order visitation with nonparents like Albert, and, even if such an order was permitted, the circumstances did not warrant granting Albert visitation with J.P. We disagree and conclude that the juvenile court did not abuse its discretion when it made the visitation order after determining that it would be in J.P.'s best interest. We affirm.

**BACKGROUND**

On July 14, 2017, the Santa Clara County Department of Family and Children's Services (Department) filed a petition under Welfare and Institutions Code section 300, subdivision (b)(1)[1] alleging that J.P. (born 2013) came under the juvenile court's

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

jurisdiction. The petition alleged that mother had been arrested for driving under the influence. J.P. and his younger half-brother, A.A., were taken into protective custody.[2]

Albert's stepmother said that Albert, mother, J.P., and A.A. lived with her from September or October 2016 through February or March 2017. Albert told the social worker that he was not J.P.'s biological father but wanted to legally adopt him. Albert was A.A.'s biological father. J.P.'s biological father, L.P., was not involved in J.P.'s life, but he was ordered to pay child support for J.P.

At the initial hearing on the dependency petition, the juvenile court found Albert to be A.A.'s presumed father and found L.P. to be J.P.'s presumed father. The juvenile court further found that a prima facie showing had been made that both children came within its jurisdiction and ordered them removed from mother and Albert's custody.

During interviews, Albert indicated to the Department that he wanted to be designated as J.P.'s presumed parent. Mother and Albert had separated during the dependency proceedings and did not intend to resume their relationship. Albert said that J.P. called him "dad," and he referred to J.P. as his son even though he was not J.P.'s biological father. Mother claimed that Albert had problems with alcohol, smoked heavily, and scared the children when he got into loud arguments. The Department determined that mother had a "long-standing alcohol issue" and Albert was "well-intentioned" but had a difficult time maintaining boundaries with mother to keep the children safe. The Department further determined that Albert had prior instances where he drank excessively.

Before the jurisdictional hearing, mother alleged that Albert had committed domestic violence against her. Albert denied the allegations of abuse but conceded that

---

[2] A.A. was also subject to dependency proceedings. J.P. and A.A.'s cases were often heard together, and the Department's reports regularly encompassed both children. Mother, however, only appeals from a visitation order affecting J.P.

2

he got into verbal altercations with mother.  Mother had requested a restraining order against Albert, and a temporary restraining order was in effect at the time the Department prepared its addendum to the jurisdictional report.  Police had responded several times to reports of disturbances between mother and Albert.

On August 23, 2017, the juvenile court held a jurisdictional hearing and found the allegations in the dependency petition to be true.  The court held a dispositional hearing several weeks later and declared both J.P. and A.A. to be dependents of the court.  Services were ordered for mother and Albert.  For J.P., the juvenile court ordered supervised visits with mother and L.P.  For A.A., the juvenile court ordered supervised visits with mother and Albert.

In November 2017, J.P. and A.A. were moved from their foster home placement to their paternal grandparents' (Albert's parents') home.  L.P. had not made his whereabouts known to the Department, and he had not had any visits with J.P.

In preparation for the six-month review, the Department prepared a status review report that recommended J.P. be returned to mother's care under a plan of family maintenance and services for L.P. be terminated.  The Department also recommended A.A. be returned to both mother and Albert and family maintenance be offered for mother and Albert's separate households.  According to the report, the domestic violence case initiated by mother against Albert had been dismissed.  Both parents had been consistent with visiting both children, and the Department believed the quality of visits was good.  The children "show[ed] comfort" in Albert's presence, and Albert appeared to be hands-on with the children when they were with him.  Albert ensured that the children were fed, took them to local parks, and appeared to provide for their basic needs such as clothing and food.  On March 27, 2018, the juvenile court adopted the Department's recommendations at the six-month review hearing.

3

On September 24, 2018, the Department filed a status review report. The report recommended that the juvenile court continue to offer family maintenance services to mother and Albert. During the review period, seven referrals of child abuse had been made concerning J.P. and A.A. The Department found most of the referrals to be unfounded and the remaining referrals to be inconclusive. J.P. had previously visited Albert with A.A., but he had not visited Albert for several months pursuant to mother's request. Albert did not have court-ordered visits with J.P.

Also on September 24, 2018, Albert asked the juvenile court to recognize him as J.P.'s presumed father. Subsequently, the court held a contested hearing on Albert's request.

During the presumed parenthood hearing, Albert testified about his relationship with J.P. Albert said that he met J.P. when the child was approximately three years old, sometime in 2016. Albert lived with mother and J.P. for approximately one and a half to two years. During that time, Albert developed a close relationship with J.P. Albert spent weekends with J.P. and mother, and Albert provided financial support for them, with the majority of the money that Albert earned going toward paying the family's bills. J.P. used to call Albert "daddy." In a recent encounter, Albert saw J.P. and tried to hug him, but mother pulled J.P. away from Albert and told J.P., " 'That's not your father, that's just [Albert].' " Albert referred to J.P. as his son and openly told others that he considered J.P. to be his son. Albert said that he was willing to financially provide for J.P.

Mother also testified at the hearing and disputed Albert's testimony. Mother said that Albert lived "off and on" with her and the children, and he would come and go as he pleased. He sometimes stayed overnight but would start arguments and would leave after getting drunk. Mother said that Albert did not provide financial support to A.A. or to mother after A.A. was born. According to mother, Albert did not spend one-on-one time

4

with J.P. Mother conceded that Albert paid some of her rent for several months after A.A. was born. Mother, however, claimed that she later gave Albert money to pay rent, but he took the money and did not pay rent, forcing mother to be evicted from her apartment. According to mother, J.P. never asked for Albert. Mother also said that J.P. told him that Albert "kissed" him during a prior overnight visit, which left a mark behind J.P.'s ear.

On October 25, 2018, the juvenile court determined that Albert did not qualify as J.P.'s presumed father under Family Code section 7611, subdivision (d). The juvenile court observed that Albert did not seek presumed parenthood status for more than a year after the dependency proceedings began, he was not J.P.'s primary caregiver, and he did not take consistent financial responsibility for J.P. The juvenile court, however, noted that this case was "a little bit of a close call" and stated that there was "no doubt" that there was a bond between Albert and J.P. The juvenile court further observed that even if Albert qualified as a presumed parent under Family Code section 7611, subdivision (d), he would not qualify as a *third parent* (L.P. was J.P.'s presumed father) under Family Code section 7612, subdivision (c). Under Family Code section 7612, subdivision (c), a juvenile court may find that a child has a third parent if "recognizing only two parents would be detrimental to the child." The juvenile court explained that there was insufficient evidence of detriment to J.P. under Family Code section 7612, subdivision (c), but acknowledged that its decision did not imply that J.P. did not suffer from "some detrimental [e]ffect" due to his separation from Albert.

After the juvenile court made its presumed parenthood determination, Albert requested regular visitation with J.P. Mother opposed the visitation request, arguing that J.P. was doing "quite well" without seeing Albert. She also did not believe that the sibling bond between J.P. and A.A. suffered from J.P. not visiting with Albert. Mother also claimed that J.P. already had other "strong, male figures" in his life aside from

5

Albert. J.P.'s attorney expressed conflicting feelings about visitation between Albert and J.P. J.P.'s attorney stated that she believed visitation would be in J.P.'s best interest in the short term, but if visits were to cease, J.P. would suffer from losing Albert from his life. The Department argued in favor of visitation between Albert and J.P., noting that J.P. and A.A. used to visit Albert together, and J.P. had a bond with Albert. The Department argued that it was not necessarily asking for an additional visit but was requesting that the trial court order that if A.A. went to visit Albert, J.P. could also come along.

After considering these arguments, the juvenile court determined that there was a bond between J.P. and Albert, and the relationship was good. The juvenile court also concluded that it would be in J.P.'s best interest to maintain his relationship with Albert. After concluding that visitation would be in J.P.'s best interest, the juvenile court ordered weekly visitation between J.P. and Albert, which the juvenile court clarified could occur when A.A. visited Albert.

## DISCUSSION

Mother argues that the juvenile court abused its discretion by ordering visitation between Albert and J.P. over her objection. Mother claims that the visitation order was unauthorized because Albert was not a presumed parent, de facto parent, or a nonrelative extended family member (NREFM) seeking to be considered as a placement option for J.P. Alternatively, mother argues that even if the juvenile court was permitted to order visitation between a child and a nonparent like Albert, visitation in this case was inappropriate under the circumstances and constituted an abuse of discretion.

1. *Authority to Order Visitation Between Child and Nonparent*

First, we find no merit in mother's claim that the juvenile court lacked the authority to order visitation between Albert and J.P. Mother argues that there is no express statutory authority for this type of visitation order, as Albert is not J.P.'s parent.

6

Although we agree with mother that there are no statutes that directly authorize the juvenile court to make such orders, the visitation order made in this case was within the juvenile court's power.

Specifically, the visitation order in this case falls within the scope of section 362, subdivision (a), which grants the juvenile court considerably broad authority to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the [dependent] child, including medical treatment, subject to further order of the court." Section 362, subdivision (d) also provides that "[t]he juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . . ."

Both mother and the Department agree that there are only two statutes that expressly discuss visitation orders made during ongoing dependency proceedings. First, the juvenile court must order visitation with parents and siblings subject to certain exceptions if the child is placed in foster care. (§ 362.1, subd. (a)(1)(A), (a)(2).) Second, the juvenile court must consider ordering visitation with grandparents if the child is removed from the parents' physical custody if "the best interest of the child" will be served by doing so. (§ 361.2, subd. (i).) However, simply because the statutory scheme *requires* the juvenile court to order visitation with parents and siblings in certain circumstances unless applicable exceptions apply and *requires* the juvenile court to consider grandparent visitation does not mean that ordering visitation with other interested individuals is not permitted. Albert may not have the statutory right to visitation, but there is nothing precluding the juvenile court from ordering visitation if it is reasonably related to J.P.'s care and is in his best interest. (See *In re Hirenia C*. (1993) 18 Cal.App.4th 504, 510 (*Hirenia C.*) [a person whose relationship with child did not rise to level of de facto parenthood has standing to bring petition requesting visitation rights

7

with child if facts establish that the person has " 'an interest' " in child as defined under § 388].)

Construing the statutes as barring juvenile courts from ordering visitation to other family members or interested individuals not expressly included in the statutory scheme, which includes de facto parents, other relatives, and NREFMs, would produce absurd results that are inconsistent with existing precedent. For example, courts have upheld visitation rights extended to de facto parents. (See *In re Robin N.* (1992) 7 Cal.App.4th 1140 [upholding juvenile court's grant of continuing visitation rights to de facto parent].) And, since courts may consider placing children with other relatives or NREFMs, it would be illogical to prohibit the juvenile court from ordering visitation with relatives or NREFMs. (See §§ 361.3 [placement of child with relative], 362.7 [defining NREFM and discussing evaluation of a NREFM's home for placement].)

Permitting the juvenile court to order visitation with nonparents if such visitation is in the child's best interest also promotes the overarching purpose of the dependency system, which is to " ' " 'maximize a child's opportunity to develop into a stable, well-adjusted adult.' " ' " (*In re Joshua A.* (2015) 239 Cal.App.4th 208, 218.) "The best interest of the child is the fundamental goal of the juvenile dependency system . . . ." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.) The juvenile court has the special responsibility to consider the totality of a child's circumstances, "including the maintenance of relationships with other adults with whom [the child has] a strong bond." (*In re J.T.* (2014) 228 Cal.App.4th 953, 964 (*J.T.*).) If the evidence presented to the juvenile court establishes that it is in the child's best interest to facilitate visitation, such an order may be permissible.[3]

_____

[3] As the Department observes, these types of visitation orders would also be consistent with the statutory requirements that a juvenile court must ensure that child welfare agencies make reasonable efforts to maintain relationships between older (continued)

8

2. *Discretion to Order Visitation Between Albert and J.P.*

Next, we examine whether the juvenile court's visitation order was properly made under the circumstances of the case. Visitation orders in dependency cases are typically reviewed for abuse of discretion and will not be reversed absent a "clear showing of abuse of discretion." (*In re Alexandria M*. (2007) 156 Cal.App.4th 1088, 1095.)

Mother argues the juvenile court abused its discretion, because there was no evidence that the factors permitting visitation identified by the court in *Hirenia C*., *supra*, 18 Cal.App.4th 504 were present in this case. In *Hirenia C*., a de facto parent sought visitation with a child following the termination of the dependency. (*Id*. at pp. 510-512, 517.) The appellate court concluded that the juvenile court was authorized to order visitation in favor of a de facto parent under section 362.4 over the adoptive parent's objection despite the "large measure of deference to parental autonomy when considering a contested issue of visitation rights for a nonparent." (*Hirenia C*., *supra*, at p. 519.)

Citing *Hirenia C*., mother argues that the *Hirenia C*. court set forth specific circumstances where a visitation order with a nonparent would be appropriate, such as where a person has " '(1) lived with the child for a substantial portion of the child's life; (2) been regularly involved in providing day-to-day care, nurturance and guidance for the child appropriate to the child's stage of development; and (3) been permitted by a

---

dependent children and "individuals other than the child's siblings who are important to the child" if the dependent child is placed in foster care. (§ 366, subd. (a)(1)(B).) The inclusion of individuals that are important to the child—a broad category that includes nonrelatives—in the dependency scheme suggests that juvenile courts may order visitation between older dependent children and important individuals to maintain these relationships. It follows that juvenile courts should also have the discretion to order visitation for younger dependent children and children who are not in foster care so long as doing so is in the child's best interest. "[W]eighing the best interests of the dependent child is always the court's paramount concern." (*In re Christopher I*. (2003) 106 Cal.App.4th 533, 550.) We can think of no reason why certain categories of dependent children should be excluded.

biologic [or adoptive] parent to assume a parental role.' " (*Hirenia C.*, *supra*, 18 Cal.App.4th at p. 519, quoting *In re Marriage of Gayden* (1991) 229 Cal.App.3d 1510, 1521-1522 (*Gayden*).) Mother's strict reliance on these factors misinterprets *Hirenia C.* Although the *Hirenia C.* court cited to these factors in its decision, it did not imply that these factors were the *only* ones that should be considered by the juvenile court when issuing visitation orders to nonparents in dependency proceedings. Nor did it imply that in the absence of these factors, the juvenile court abuses its discretion by ordering visitation.

The *Hirenia C.* court referenced these three factors when it analyzed whether parents have the "unfettered right" to determine who can visit with their child. (*Hirenia C.*, *supra*, 18 Cal.App.4th at p. 519.) The *Hirenia C.* court noted that it had, in the past, held that "courts must give a large measure of deference to parental autonomy when considering a contested issue of visitation rights for a nonparent" (*ibid.*), citing to its decision in *Gayden*, *supra*, 229 Cal.App.3d 1510 and listing the three factors relied upon by mother here. The *Hirenia C.* court, however, observed that its decision in *Gayden* was careful to limit its holding with the observation that "courts are not required to submit in every case to the objection of a biologic or adoptive parent to a visitation award to another person with whom the minor has developed a close attachment." (*Hirenia C.*, *supra*, at p. 519, citing *Gayden*, *supra*, at p. 1521.)

*Gayden* was a family law case. (*Gayden*, *supra*, 229 Cal.App.3d 1510.) And in *Hirenia C.*, an adoption had been finalized and it was the adoptive parent who objected to the juvenile court making a visitation order to the nonparent. (*Hirenia C.*, *supra*, 18 Cal.App.4th at p. 517.) The adoptive parent in *Hirenia C.* was not an offending parent; she took the child into her care after the child was placed in her foster care home. (*Id.* at p. 510.) Both parents in *Gayden* and the adoptive parent in *Hirenia C.* were not unfit and were entitled to a presumption that they acted in their child's best interest. (*J.T.*, *supra*,

10

228 Cal.App.4th at p. 964 [fit parent entitled to presumption that he or she is acting in child's best interest]; *Troxel v. Granville* (2000) 530 U.S. 57, 68 (*Troxel*) ["there is a presumption that fit parents act in the best interests of their children"].)

In contrast, mother does *not* have the benefit of a presumption of parental fitness. (*J.T.*, *supra*, 228 Cal.App.4th at p. 963 [mother that was before dependency court did not have benefit of presumption of parental fitness]; *In re Chantal S*. (1996) 13 Cal.4th 196, 206 [presumption of parental fitness that underlies custody law in family court does not apply in dependency cases].) J.P. came within the juvenile court's jurisdiction and was removed from mother's care after mother was arrested for drunk driving. J.P. was eventually returned to mother's care under a plan of a family maintenance, but his return to mother did not mean that she is no longer considered unfit. Under the statutory scheme, children must be returned to their parents at a status review hearing *unless* the court finds that there is a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. (§ 366.21, subd. (e).) A determination that a child is not at a substantial risk of detriment in a parent's custody in a dependency proceeding does not confer a finding of parental fitness on an offending parent and does not automatically terminate a dependency.[4] The dependency proceedings were still ongoing. As a result, mother does not benefit from the presumption that she acts in her child's best interests.

It follows that in a family law proceeding like *Gayden*, visitation orders made over a parent's objection should be evaluated using a different rubric. Family court and

---

[4] In her reply brief, mother cites to *In re G.S.R.* (2008) 159 Cal.App.4th 1202 and argues that in California, when there is no detriment finding there is no finding of parental unfitness. Mother misreads *In re G.S.R.*, which reiterated the principle that due process requires a finding of parental unfitness before parental rights may be severed. (*Id*. at pp. 1210-1212.) Nothing in *In re G.S.R.* contradicts the principle that the presumption of parental fitness is inapplicable in dependency cases.

11

juvenile court serve different purposes. (*In re Chantal S*., *supra*, 13 Cal.4th at pp. 200-201.) "The family court is established to provide parents a forum in which to resolve, inter alia, private issues relating to the custody of and visitation with children. . . . The juvenile court, by contrast, provides the state a forum to 'restrict parental behavior regarding children, . . . and . . . to remove children from the custody of their parents and guardians.' " (*Id*. at p. 201.) Logic dictates that visitation orders in family law proceedings should be made over a parent's objection only under certain circumstances so as not to infringe upon a parent's fundamental right to make decisions concerning their children's care, such as if the factors outlined in *Gayden* and later echoed in *Hirenia C*. are met. (*Gayden*, *supra*, 229 Cal.App.3d at p. 1521; *Hirenia C*., *supra*, 18 Cal.App.4th at p. 519; see *Troxel*, *supra*, 530 U.S. at pp. 65-66 [parents have fundamental right to make decisions concerning care, custody, and control of their children].) Whereas, the best interest standard governs in dependency proceedings, and the juvenile court should exercise its discretion to craft visitation orders for nonparents only after making a finding that doing so would be in the child's best interest. (See *In re Korbin Z*. (2016) 3 Cal.App.5th 511, 518 [juvenile court has broad discretion to determine what is in child's best interest when fashioning dispositional order]; *J.T*., *supra*, 228 Cal.App.4th at pp. 962-964 [visitation order made over mother's objection did not infringe upon her fundamental right to parent].)

In fact, the best interest standard is the one ultimately applied by the *Hirenia C*. court despite its reference to the factors described in *Gayden*. In *Hirenia C*., the appellate court held that if there was "competent evidence that it would be in [child's] best interests to have visitation with appellant, [the juvenile court] may enter an order to that effect . . . ." (*Hirenia C*., *supra*, 18 Cal.App.4th at p. 520.) Thus, if sufficient evidence supports the juvenile court's determination that the visitation order was in J.P.'s best interest, the juvenile court did not abuse its discretion.

12

Here, the record reflects that the juvenile court expressly determined that visits between Albert and J.P. was in J.P.'s best interest and this finding is supported by the evidence in the record. J.P. had a bond with Albert; he used to live with Albert and used to call Albert "daddy." Albert said that he developed a close relationship with J.P. and wanted to maintain the relationship. Albert also said that he used to take J.P. on family outings, and they spent weekends together. During the hearing, the Department expressed that Albert and J.P. shared a bond and recommended that the juvenile court order visits. The Department's prior reports indicated that when J.P. visited with Albert, the visits were generally good, and both children, including J.P., "show[ed] comfort" in Albert's presence. Albert was also hands-on with the children when they were with him. During visits, Albert ensured that the children were fed and took them to local parks, buying them items such as clothes and food.

We acknowledge that there was evidence weighing against ordering visits. Mother disputed Albert's testimony. She claimed that J.P. did not ask about Albert and was happy "where he [was] at." Mother also disputed Albert's claim that he used to live together with mother, J.P., and A.A., describing Albert as merely living with them "off and on." The juvenile court, however, could have reasonably discredited her testimony as motivated by her animosity toward Albert. And, although mother alleged that Albert was abusive, the allegations of abuse were investigated and were determined to be either unfounded or inconclusive. J.P.'s attorney expressed that he believed that in the short term, visits would be beneficial to J.P., but worried that if visits were cut off in the future, J.P.'s loss of "that figure from his life" would be detrimental.

The existence of evidence supporting mother's position does not demonstrate that the juvenile court abused its discretion. Our role is not to substitute our judgment for that of the juvenile court or reweigh the evidence. " ' " 'The appropriate test for abuse of discretion is whether the [juvenile] court exceeded the bounds of reason. When two or

13

more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465.)  Here, there was sufficient evidence supporting the juvenile court's determination that ordering visitation with Albert would be in J.P.'s best interest.[5]  As a result, we find no abuse of discretion.

### DISPOSITION

The juvenile court's order is affirmed.

---

[5] When the juvenile court determined that Albert did not qualify as J.P.'s presumed parent, it concluded that there was insufficient evidence of detriment as required under Family Code section 7612, subdivision (c).  We note that a finding that there is insufficient evidence of *detriment* if Albert is not found to be J.P.'s *third parent* is not logically inconsistent with a conclusion that visitation with Albert would be in J.P.'s best interest.

_____

                      Premo, J.

WE CONCUR:

_____

           Greenwood, P.J.

_____

              Elia, J.

In re J.P.; DCFS v. M.D.
H046491

| | |
|---|---|
| Trial Court: | Santa Clara County<br>Super. Ct. No. 17JD024630 |
| Trial Judge: | Hon. Amber Rosen |
| Counsel for Plaintiff/Respondent:<br>Santa Clara County Department of<br>Family and Children's Services | James R. Williams, County Counsel<br>Hilary T. Kerrigan,<br>Deputy County Counsel |
| Counsel for Minor:<br>J.P., | No appearance |
| Counsel for Defendant/Appellant:<br>M.D. | Under Appointment of the Court of Appeal<br>Leslie A. Barry<br>Michelle Jarvis |

In re J.P.; DCFS v. M.D.
H046491