Filed 10/10/25  In re Angel B. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re ANGEL B., a Person Coming Under the Juvenile Court Law. | B341429 (Los Angeles County Super. Ct. No. DK21285) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.B., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore. Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant mother's appeal raises one issue: Did the juvenile court abuse its discretion in requiring four monitored visits before mother could have unmonitored visitation with her daughter, Angel. The juvenile court assumed jurisdiction over Angel when she was five years old and she is now a young teen. As long as Angel has been in the dependency system, mother has vacillated between wanting a relationship with Angel and eschewing reunification, which in turn, has sometimes triggered Angel's extreme negative behavior. We conclude the juvenile court thus did not abuse its discretion in setting the above limited visitation parameter before allowing unmonitored visitation. We thus affirm.

## BACKGROUND

Angel was born in March 2012 and became a dependent of the juvenile court in 2017.[1] In 2016, prior to the dependency proceedings, Angel lived with maternal great grandmother because mother was overwhelmed and unable to care for Angel. After Angel returned to mother's care, maternal great

_____

[1] In September 2017, Angel's half sibling was born. This appeal does not involve Angel's half sibling. We summarize only those facts relevant to the sole issue mother raises on appeal.

2

grandmother noticed that Angel would visit with new bruises and complain of mother spraying hot sauce in her mouth.

Angel has been in and out of her mother's care during the dependency proceedings, and mother's ambivalence towards parenting Angel has materially negatively affected Angel's well-being. We thus detail below these circumstances leading to the visitation restriction at issue in this appeal.

## A.   The Juvenile Court Sustains the Original and Supplemental Petitions

In June 2017, the juvenile court sustained allegations mother physically abused Angel by repeatedly striking her body and face with a belt and mother's open hand and by pouring "hot sauce in the child's mouth as a form of discipline. The child is afraid of the mother. Such physical abuse was excessive and caused the child unreasonable pain and suffering."

In May 2018, the juvenile court sustained supplemental allegations that mother physically abused Angel by pinching her face and such abuse caused unreasonable pain and suffering. The juvenile court also sustained the allegation that Angel was at risk of physical and emotional harm because her half sibling's father was convicted of a lewd or lascivious act with a child under 14.

**B. Mother's Visits Are Inconsistent During Angel's Placements, and Shortly After Mother Regains Custody of Angel, Mother Requests Angel's Removal**

### 1. *DCFS places Angel with maternal great grandparents*

In January 2017, DCFS placed Angel with maternal great grandparents. Angel was four years old at the time. Maternal great grandmother reported Angel was physically and verbally aggressive, defiant, and impulsive.

In February 2017, the court ordered mother's visits monitored but mother did not visit Angel. In March 2017, mother told a social worker, "I want my daughter, but I need 4 to 6 months."

Mother visited Angel on March 31, 2017, and Angel "was visibly anxious before and after her visit with her mother [and] that after the visit Angel fell asleep for 2 hours due to exhaustion." In December 2017, DCFS reported mother started visiting consistently, arrived prepared for visits, and set appropriate limits for Angel. DCFS reported mother and Angel were "mutually affectionate."

In December 2017, the juvenile court ordered mother's visits unmonitored. The unmonitored visits "reportedly went well, with no major concerns reported by caregiver or child."

### 2. *Angel returns to mother's custody*

In February 2018, the juvenile court returned Angel to mother's custody. Within two weeks, mother reported Angel was verbally and physically aggressive and would kick and hit mother.

On April 3, 2018, Angel told a counselor mother pinched her left cheek and burnt her teddy bear on the stove. The counselor reported, "[M]other is becoming more aggressive with" Angel. Mother admitted to scratching Angel's cheek "while trying to restrain her" and also admitted to burning the teddy bear on the stove. [2] Mother told the social worker Angel kicked her in the groin and stomach and they constantly fought. Mother told the social worker she was "overwhelmed" and "needed a break." Mother reported she had called the police a month earlier to request "Angel to be removed from her care," but the police did not respond to her call. Mother stated Angel was aggressive, and mother could not control her. The social worker observed that mother's home was "filthy" and Angel did not have a bed.

When the social worker interviewed Angel, Angel "admitted fighting her mother and kicking her sometimes."

In April 2018, Mother requested that Angel be removed from her care and was "relieved" when DCFS did so.

### 3. *DCFS places Angel in shelter care*

On April 3, 2018, DCFS detained Angel and placed her in shelter care. Maternal great grandmother "stated that she [was] happy that DCFS intervened and removed [Angel] from mother." Maternal great grandmother told the social worker mother was unable to control Angel and that they were constantly fighting.

---

[2] Although mother initially admitted to scratching Angel's cheek, she later denied the allegation.

### 4.    *DCFS places Angel in E.C.'s foster home*

On April 13, 2018, DCFS moved Angel to E.C.'s foster home.  Angel looked forward to her monitored visits with mother and wanted to live with mother.  Mother visited two times per week for two hours.  E.C. had unexpected medical issues requiring Angel to be removed from her care.

### 5.    *DCFS places Angel in a respite home*

DCFS requested mother identify any possible nonrelated extended family members for placement.  Mother did not respond in six days.  In May 2018, DCFS placed Angel in a "respite home, licensed through Building Bridges."

### 6.    *DCFS places Angel in B.N. and A.N.'s foster home*

On June 1, 2018, DCFS placed Angel in B.N. and A.N.'s foster home.  On June 1, 2018, DCFS reported mother had not visited in two weeks.  Mother stated she did not want to reunify with Angel.

In July 2018, however, DCFS reported mother was visiting consistently and Angel's foster parents reported no concerns after mother's visits.  Angel reported enjoying her visits with mother.

At the end of July or beginning of August 2018, the foster parents requested that Angel be removed from their care because Angel tripped the foster mother.  The foster parents also reported Angel tried to remove the foster parents' daughter's pants and underwear.

**7.** ***In August 2018, DCFS places Angel with maternal great grandparents***

On August 3, 2018, Angel returned to her maternal great grandparents' care. Angel liked living with maternal great grandparents, but was "impulsive" and threatened violence. Angel also threatened to kill paternal grandfather. Angel also exhibited sexual behavior, such as removing her clothing and simulating masturbation.

Mother had monitored visits with Angel once a week for two hours. Angel enjoyed the visits. Maternal great grandmother reported, "[M]other does not engage well with Angel and spends a good portion of the visit on her phone while Angel plays with her toys." Maternal great grandmother also reported, Angel said, "[S]he loves her mom." Angel said she was living with maternal great grandparents because mother "doesn't want me." Angel told the social worker she preferred living with maternal great grandparents than with mother.

In December 2019, DCFS reported that Angel did not want to go to school and would kick and bite maternal great grandmother. Maternal great grandmother wanted mother to attend therapy with Angel but mother refused. At that time, mother continued to visit once a week. (DCFS did not indicate whether these weekly visits were monitored.) Angel's behavior became "more defiant" after her visits with mother. Mother again told the social worker she no longer wanted to reunify with Angel.

After maternal great grandfather died, maternal great grandmother requested that Angel be removed from her home. Angel had been physically aggressive with maternal great

7

grandmother, used her credit card without permission, and would watch pornography on television without permission.

### 8. *DCFS places Angel in A.B.'s home*

On May 22, 2020, DCFS moved Angel to A.B.'s foster home. Mother visited once weekly with a monitor.

In February 2021, A.B. reported Angel was defiant, wiped feces on the walls, wrote on furniture, and broke items in the home. Angel's behavior deteriorated when she had visits with mother. In September 2020, mother stopped visiting.

On June 30, 2021, A.B. requested DCFS remove Angel from her home.

### 9. *DCFS places Angel in Hillsides Residential Treatment Program*

On July 27, 2021, DCFS placed Angel in Hillsides Residential Program. In July 2021 mother resumed weekly monitored visits. Angel was happy to see mother during the visits but did not want to live with mother.

In December 2021, mother began unmonitored visits. On December 8, 2021, the court permitted Angel to have an extended holiday visit with mother.

### 10. *DCFS places Angel in C.C.'s foster home*

On December 14, 2021, DCFS placed Angel in C.C.'s foster home. Within one month, C.C. "reported having difficulties managing Angel's behavior" and expressed concern that Angel refused to go to school. Angel's school reported Angel slept in class and would bully other children. Angel had overnight and weekend visits with mother. According to a social worker, "The quality of the overnights have varied. On two visits, Angel has

become physical with mother. One incident resulted in Angel leaving a bruise on mother's arm."

On August 13, 2022, Angel "was placed on a 72-h[ou]r hold . . . after throwing objects at caregiver, chasing the other child in the home with a wooden stake, and running in the streets." The hospital released Angel on August 29, 2022 and she returned to C.C.' s home.

Angel lived with C.C. for approximately one year until C.C. requested Angel's removal "due to escalating aggressive behaviors towards peers and caregiver . . . ."

### 11. *DCFS places Angel at Five Acres*

On January 24, 2023, DCFS placed Angel at Five Acres, a residential therapeutic program.

DCFS reported, "Mother would like to resume overnights with Angel once [mother] moves . . . to a bigger apartment . . . ." DCFS reported Angel had unmonitored visits with mother every other weekend.

On July 14, 2023, Angel expressed suicidal ideation and was hospitalized. Angel returned to Five Acres on August 10, 2023.

In September 2023, DCFS reported that mother started conjoint therapy with Angel. The therapist, however, "determined mother was not ready" and discontinued the conjoint therapy. Mother was unable to focus on Angel during the conjoint therapy sessions. Mother and Angel continued their overnight visits every other weekend. Angel's therapist reported, "Angel has regressed, and her tantrums have become childlike, e.g., stomping her feet when upset."

On September 12, 2023, Angel ran away from school and the police located her later that date and transported her back to Five Acres.

On September 13, 2023, when Angel was told to clean her room and complete her hygiene tasks, Angel "began to yell at staff and made statements that she was 'going to kill everyone by burning this place down.'" Angel repeated she would kill everyone and added that she would kill herself. Angel was transported to a hospital and then returned to Five Acres the next day.

On September 21, 2023, Angel was physically aggressive on the school bus and was suspended from riding the bus for six days.

On October 4, 2023, Angel left Five Acres and took public transportation to mother's home. Mother contacted Five Acres and Angel returned there.

On October 5, 2023, Angel threatened "to blow up" Five Acres. She said that she made that statement because she did not want to live there. The next day Angel was placed on a psychiatric hold. On October 11, 2023 Angel returned to Five Acres.

### 12. *DCFS places Angel in F.T.'s home*

On December 1, 2023, DCFS placed Angel in F.T.'s home.

In March 2024, DCFS reported mother no longer visited Angel. On December 13, 2023, mother decided she no longer wanted overnight visits and no longer wanted to reunify with Angel. Angel had a planned visit with mother in January 2023, but "mother turned [Angel] . . . away stating that she was going to a concert instead and could no longer visit." Angel was "very upset" and asked mother how "she could turn" her away.

10

Mother told Angel that mother would not reunify with her and that "she won't be visiting as often." DCFS reported that mother statements "affected Angel emotionally and she has a difficult time talking about it." Mother told the social worker "she felt pressure from family to reunify with Angel, but now recognizes that she is not equipped to parent Angel."

In an undated report, DCFS reported mother was no longer approved for unmonitored visits.

On March 29, 2024, the juvenile court issued a protective custody warrant for Angel because she was missing. The court recalled the warrant on April 4, 2024 because Angel was located. After Angel ran away, F.T. requested that Angel be removed from her care.

### 13. *DCFS places Angel with maternal great grandmother*

On April 16, 2024, DCFS placed Angel with maternal great grandmother. Mother visited several times and her visits initially included overnights, but Angel then refused overnight visits with mother because she was upset with her. In July 2024, DCFS removed Angel from maternal great grandmother's home because of "Angel's daily defiance, stealing, and physical aggression."

### 14. *DCFS places Angel in J.S.'s foster home*

On July 15, 2024, DCFS placed Angel in J.S.'s foster home. Except for attending a dance recital, mother did not have contact with Angel since Angel was placed in J.S.'s home. DCFS reported when mother learned Angel was doing well in J.S.'s home, mother stated "she no longer plans to reunify with Angel." DCFS

11

reported mother said that she was "foregoing visits" so that she did not "disrupt" Angel's new placement.

## C. Despite Mother's Inconsistency In Visiting Angel and Desire Not To Reunify, the Court Permitted Mother Additional Reunification Services

In September 2018, mother waived further reunification services, indicating she did not wish to reunify with Angel. The juvenile court ordered no further reunification services.

In April 2019, mother filed a Welfare and Institutions Code[3] section 388 petition requesting her reunification services be reinstated. Mother asserted: "I have made progress in my parenting and individual counseling. I have learned tools to parent Angel in an appropriate and loving way. Angel is also receiving therapy and medication for her ADHD, which helps to reduce her behavioral issues. I am also keeping up with my anger management classes, individual counseling and have completed family communication skills." On July 2, 2019, the court granted mother's request for additional reunification services. As of December 2019, mother had not participated in any reunification services. In December 2019, DCFS reported again mother no longer wanted to reunify with Angel.

In January 2020, the juvenile court terminated mother's reunification services.

On July 19, 2021, mother filed another section 388 petition requesting additional reunification services. Mother asserted Angel's "behavior hasn't improved because the fact is she feels I don't want her but that's not true. I'm more mentally and

---

[3] Undesignated statutory citations are to the Welfare and Institutions Code.

12

financially stable now than before." On September 7, 2021, the court noted mother waived reunification services, then obtained additional reunification services and then her reunification services were terminated. Nevertheless, the court was willing to consider mother's section 388 petition on the merits, hoping for "a chance to help this child."

"This is the last one." The court stated, "Let's see if mother's really going to follow through." The court ordered DCFS "to work with mother to reunify" with Angel and to provide mother referrals.

**D.    In September 2024, After a Hearing, the Court Ordered Four Monitored Visits Prior To Permitting Mother Unmonitored Visitation**

At a September 23, 2024 hearing, mother's counsel stated, "Mother would be objecting to her visits being reverted to monitored today." Counsel indicated that DCFS misunderstood mother. Mother did not want to forego visits completely, but "only [to] halt visits until Angel is . . . stable in the home of the caregiver." Mother's counsel asserted (without evidentiary support) that mother had visited August 4, 2024 (approximately six weeks before the hearing). Mother's counsel requested Angel's therapist "assess when it would be appropriate for mother to resume her visits . . . ."

DCFS requested the juvenile court order mother's visits monitored. DCFS's counsel noted the "tenuousness" of Angel's placements and reminded the court that this case was not in reunification period.

Angel's counsel argued, "I do think it would be in Angel's best interest that visits stay as they are" (which counsel did not further explain). According to Angel's counsel, "Mother is a very

13

important person to Angel." Acknowledging that mother had not been visiting, counsel added, "[H]opefully mother will begin to start visiting Angel, soon."

The court stated, "The court does have concerns and notes that we are not in reunification and would like to see some monitored visits before the court allows the visits to continue as unmonitored in light of the new placement changes that have occurred and will order that four monitored visits occur. [¶] And if there are no concerns or issues and Angel seems to be doing well, then the visits can revert back to unmonitored in a neutral setting."

## E.    Juvenile Court Order

The court's September 23, 2024 order stated in pertinent part: "Mother is to have 4 monitored visits with Angel . . . and if no concerns, then DCFS is to permit unmonitored visit to resume . . . ." This is the order that is the subject of this appeal.

## DISCUSSION

Mother argues, "The juvenile court erred when it restricted mother to monitored visitation." (Boldface & capitalization omitted.) According to mother, "There is no benefit to Angel for requiring monitored visitation and the child was not at risk in Mother's care."

When a juvenile court orders visitation between a parent and child, visitation shall be as frequent as possible, but no visitation order shall jeopardize the child's safety. (§ 362.1, subd. (a).) This includes both the child's physical and emotional safety. (*In re T.M.* (2016) 4 Cal.App.5th 1214, 1219.) In fashioning visitation orders, the juvenile court's focus is on the child's best interests. (*In re C.M.* (2019) 38 Cal.App.5th 101,

14

109.) We review a visitation order for an abuse of discretion. (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1119 ["Visitation orders in dependency cases are typically reviewed for abuse of discretion and will not be reversed absent a 'clear showing of an abuse of discretion.' "].) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

Given Angel's dependency history, we conclude the juvenile court did not abuse its discretion in requiring four monitored visits before allowing unmonitored visitation.

Throughout the dependency proceedings, Angel has been shuttled in and out of multiple caretaking placements either because mother, by her own admission, either was unable to handle Angel or was not interested in reunifying with her. Most recently, Angel began living with J.S. on July 15, 2024, about two months prior to the juvenile court's order. During that time, mother stopped visiting. Although mother's counsel represented mother visited on August 4, 2024, the evidence demonstrates that except for attending a dance recital, Mother did not have contact with Angel since Angel was living in J.S.'s home. The four monitored visits are a reasonable means to allow the monitor to assess mother's and Angel's relationship after mother had voluntarily stopped visiting and after mother had abandoned a scheduled visit just to attend a concert. Monitored visitation would also give data to the court in assessing whether the physical aggression present earlier in mother and Angel's relationship was resolved and whether mother was able to

15

commit to Angel's needs during the visits, something maternal great grandmother and the conjoint therapist questioned. Although mother had progressed to unmonitored overnight visits, Angel refused the overnight visits shortly before mother stopped visiting. Mother never completed conjoint counseling and there was no therapist assessment as to mother's ability to interact with Angel positively so as to ensure Angel's physical and emotional well-being.

Ordering four monitored visits did not prevent Angel from seeing mother or in any way limit the frequency of Angel and mother's visits. Contrary to mother's assertion, it did not prevent her from "preserv[ing]" her relationship with Angel. Instead, the court imposed a short limitation on unfettered visitation to ensure Angel's *well-being*, an apt term given mother's repeated assertions of inability or lack of desire to reunify with Angel. Even mother appeared to acknowledge whether her visits were in Angel's best interest when she asked that Angel's therapist assess when it would be appropriate for mother to resume her visits. In sum, we agree with respondent that in light of mother's ambivalence about parenting Angel and the emotional toll that ambivalence has taken on Angel throughout the dependency proceedings, the juvenile court's order requiring four monitored visits was "measured" and "did not exceed the bounds of reason."

## DISPOSITION

The juvenile court's September 23, 2024 order requiring four monitored visits is affirmed. Mother has not otherwise challenged the September 23, 2024 order, which we therefore affirm in its entirety.

NOT TO BE PUBLISHED.


BENDIX, Acting P. J.


We concur:



WEINGART, J.



M. KIM, J.