Filed 8/31/23 In re S.B. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re S.B., a Person Coming Under Juvenile Court Law. | B320433 c/w B323506 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.B., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 21CCJP03835A) |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge. Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

### INTRODUCTION

Father appeals from a dispositional order on the sole ground that the juvenile court erred in requiring his visits with his daughter to be monitored. Because the court acted within its discretion in ordering monitored visitation, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1.  *Father's Alcohol Abuse, Resulting Divorce, and Joint Custody of S.B.*

Mother and C.B. (father) married in 2007 and had one daughter (S.B.) born in 2009. They divorced in 2014 due to father's anger, alcohol abuse, and verbal abuse of mother, which twice escalated to physical abuse. Evidence was that when father consumes alcohol, his anger becomes a "blind rage"; he turns into "a completely different person"; and he exhibits strange, erratic, and aggressive behavior. S.B. first noticed father's drunken behavior when she was about five years old and saw him "stumbling a lot" and acting "weird."

Mother and father's divorce resulted in a family court custody order granting joint physical and legal custody, and requiring that neither parent "make disparaging remarks about the other . . . around the child [or] . . . be under the influence of alcohol." Despite the custody order, according to S.B., father continued to drink two to three bottles of wine per night when he had custody of S.B. He also continued to speak negatively about mother to S.B.

Father generally remained sober during the day and began drinking alcohol after dinner. When he drank, father was controlling of S.B. and made degrading comments towards her. Mother documented numerous instances of father's misbehavior between 2015 and 2021 on the Family Wizard application. Some

2

examples include: "physically holding" S.B. in place "until she apologized 'for nothing' " twisting S.B.'s arm; calling her a "robot daughter"; telling her that her artwork was no good; and keeping her on the phone while she was at the beach with mother to ask her the same question repeatedly. Father sometimes drunk dialed S.B. while she was in mother's care, sounding "strange or weird," making "non-sensical comments," and causing S.B. to become sad or bewildered. One time, when father was driving while drunk and S.B. was a passenger, she witnessed him drive over the curb. On another occasion, father got into S.B.'s bed and refused to leave, stating that "the President told [him] to stay until it's cleared out."

As S.B. got older, she became increasingly anxious before leaving mother to stay with father, and she was "triggered just walking into his house" because she already knew what was in store. S.B. attended therapy starting around 2018, and father's alcohol abuse, degrading comments to S.B., and negative statements about mother were recurring themes in her therapy sessions. S.B.'s therapist diagnosed her with anxiety disorder, which was "situational/environmental, rather than organic." Father ardently opposed S.B.'s therapy and insisted that he did not believe in therapy generally.

Father's drunken misbehavior around S.B. came to a head on August 4, 2021, when he mocked S.B. for reading a book, demanded that she read aloud, and ridiculed her for attending therapy. He also told her she was "fucked up," "full of shit," "a pussy," and "weak." When S.B. told father she wanted to live with mother full time, father responded that he would cut her out of his life and leave her. S.B. retreated to her room and sobbed all night. The next day, father sent S.B. an email "trying to

3

apologize," in which he explained why he had "acted out" and expressed his frustration with mother for "infring[ing] on" father and S.B.'s time together.

**2.    *Dependency Proceedings***

On August 13, 2021, mother filed a request for an expedited removal order, and S.B. was removed from father and placed with mother that day.

On August 17, 2021, the Department of Children and Family Services (the Department) filed a petition under Welfare and Institutions Code section 300, alleging under subdivision (b)(1) that father's history and current abuse of alcohol rendered him incapable of providing regular care for S.B. and placed her "at risk of serious physical harm and damage," and under subdivision (c), father had "created a detrimental home environment" for S.B. "by emotionally abusing" her, "verbally berat[ing] and degrad[ing]" her, and by calling her "derogatory and demeaning names, resulting in [S.B.] feeling stressed, depressed and . . . anx[ious]."[1]

At the detention hearing on August 20, 2021, S.B. was ordered removed from father and placed with mother. The juvenile court ordered monitored visitation for father for a minimum of three, three-hour visits per week.

In the months that ensued, father continued to exhibit controlling behavior during his visits with S.B. For example, he refused to buy S.B. a snack or a drink even though he did not bring any snacks or drinks to the visits. Another time, S.B. requested that father buy her a bag of apple chips, and father refused, instead offering to buy her fruit. He eventually bought

---

[1]    All further statutory references are to the Welfare and Institutions Code.

4

her a very small package of apple chips, after which he asked her for some. When she refused, he asked again, "but in a more aggressive manner." He then told her that she should pay for her own snacks, prompting the monitor to intervene. On another occasion, S.B. brought $10 with her to a visit at Starbucks because of father's ongoing refusal to provide snacks or drinks during visits. When S.B. sat down with father after buying herself a drink, father asked the 12-year-old if she had purchased him a drink, again prompting the monitor to intervene to tell father to buy his own drink. Father "argue[d] about purchasing snacks or drinks for no apparent reason." Father's behavior irritated S.B., but she "[didn't] show it because she [didn't] want confrontation."

Father also violated the visitation rules by slipping two letters into a birthday gift he brought for S.B.—one for S.B., and one for mother. He once yelled at a social worker, and on another occasion sent "abrasive" text messages to the owner of the professional monitor service when she declined to monitor his visits.

When the Department interviewed father about the August 4, 2021 incident, father estimated that he had three to four glasses of wine and stated that he did not know whether he was drunk. He attributed his lashing out to "ongoing issues" "with mother," S.B.'s therapy, and S.B.'s use of electronic devices.

Father submitted to drug and alcohol tests, all of which were negative.

The adjudication hearing was held on February 24 and March 8, 2022. Father testified that when he drinks alcohol, he "may have a glass or two of wine, maybe a beer or two." When asked about "a particular disagreement" at father's house that

S.B. had complained about—apparently referring to the August 4, 2021, incident that preceded S.B.'s removal and the filing of the section 300 petition—father responded, "I'm thinking it might have been about her [iPad] use, which I've always been concerned about . . . ." When asked whether he had ever called S.B. any name aside from her given name, father listed a series of affectionate nicknames, such as "honey bear" and "baby doll." Father only admitted he "said a lot of terrible things" after his counsel specifically asked him about the August 4th incident, which father followed with the statement that he "always owned up to what [he] said." Father denied making various negative statements about mother to S.B., insisted that he "never" consumed alcohol while S.B. was with him (aside from the August 4 incident), and denied ever driving over a curb on the sidewalk. When asked how recently he had been intoxicated outside of S.B.'s presence, he responded "when [he] was in college . . . pledging for a fraternity." Father submitted evidence from three witnesses who stated that father was "a great Dad" who had "great moral character." One reported that he had been at parties with father and S.B. and that father had not seemed intoxicated around her.

S.B. testified that between the ages four and eleven (her age when she was removed from father), she saw father drinking alcohol "pretty much" every time she saw him, which was three to four days a week. She also testified that father called her "a robot daughter quite a few times before," which "didn't make [her] feel good", and that he called mother "a loser" and said that mother "is not a good person." S.B. stated that she did not feel comfortable seeing father without a monitor because "he could easily talk about the case or anything like that." And when

6

asked whether she would feel comfortable seeing him without a monitor after the case was over, she responded "I don't know." She also testified that she loved her father and that she knew he loved her.

The court made minor modifications to the allegations in the section 300 petition and sustained both counts as modified.[2]

The disposition hearing occurred on April 13, 2022. Father testified that he had "a counselor that's lined up . . . for conjoint therapy." When asked about the quality of his visits with S.B. since the adjudication hearing, he testified that he "would prefer . . . unsupervised visits," which he thought he had "more than earned." Father requested "50/50 custody that [he had] always had up until these proceedings." Father then proceeded to list "ramifications" for S.B. if father's full rights were not restored, and then proceeded to go into "all kinds of ways that this is going to impact [him] negatively," at which point the court cut him off because there was no question pending. When asked how he would describe his relationship with S.B., he responded, "it's outstanding, and it's always been outstanding." Counsel for mother, S.B., and the Department all urged the juvenile court to terminate jurisdiction and award mother sole custody, with monitored visitation, if any, for father. Father requested joint custody, legal if not physical, and requested unsupervised visitation if granted visitation rights. The juvenile court observed that father "has not made any kind of acknowledgment of his own role in the daughter being upset at the alcohol abuse," and that "appellate courts have recognized that one cannot

---

[2]     These modifications include changing "history of substance abuse" to "history of substance use," and replacing "current abuser of alcohol" with "recent excessive user of alcohol."

change a problem one does not [ac]knowledge." The court ordered that mother have sole physical custody, mother and father have joint legal custody, with the exception that mother have the sole legal right to make decisions about S.B.'s counseling, and that father have visits monitored by a professional or mutually agreed-upon monitor. The court terminated jurisdiction, but stayed the order pending issuance of the juvenile custody order.

Father filed a notice of appeal on May 11, 2022. After several amendments to the juvenile custody order, the final version was filed on August 29, 2022, and the juvenile court terminated jurisdiction. Father filed another notice of appeal on September 7, 2022. Upon father's motion, we consolidated his appeals.

### DISCUSSION

Father contends the trial court erred in requiring his visits with S.B. to be monitored. A juvenile court has broad discretion to make visitation orders when it terminates jurisdiction. (§ 362.4; *In re J.M.* (2023) 89 Cal.App.5th 95, 112-113.) These orders are reviewed for abuse of discretion. (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1119; *In re Alexandria M.* (2007) 156 Cal.App.4th 1088, 1095 (*Alexandria M.*).) In other words, we must determine whether the juvenile court's order " 'exceeded the bounds of reason.' " (*Alexandria M.*, at pp. 1095-1096; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

The juvenile court acted well within its discretion in ordering monitored visits for father. Despite the family court's 2014 joint custody order prohibiting father from drinking in S.B.'s presence, father consumed alcohol each time she stayed with him. He also continued to speak negatively about mother to

8

S.B. in violation of the 2014 order. When father drank, he acted in a controlling, aggressive, and erratic manner that scared S.B., and that caused her more and more anxiety as she got older. Father also called S.B. hurtful names during his alcohol episodes. Mother documented numerous instances of father's strange, inappropriate, and "scary" behavior around S.B. Maternal uncle also reported seeing father go "into a rage" after "he consumed at least a full bottle of wine." Yet as the juvenile court observed, throughout the proceedings, father failed to acknowledge his excessive drinking, let alone the serious emotional harm it was causing S.B. He denied ever getting drunk in S.B.'s presence aside from August 4, 2021. S.B. consistently reported that she did not feel comfortable visiting father without a professional monitor because she was afraid that father would speak with her about the case or about other matters he should not discuss with S.B. Even with a professional monitor present, father sometimes behaved in a controlling and aggressive manner with S.B., which on at least two occasions caused the monitor to intervene.

S.B. was asked whether she would be comfortable seeing her father without a monitor, S.B. responded, directly: "No." When asked why he thought S.B did not want to visit father without a neutral monitor, he responded that he "believe[s] that her mother is negatively influencing and coaching."

Father points out that "[t]here was no question that [S.B.] and [f]ather were bonded and loved each other very much." Indeed, S.B. testified to her "great relationship" with her father. Father also testified to good times with S.B., including the birthday card from S.B. in November of 2021 that father offered into evidence. It said, "You have been the best dad forever and always will be." The juvenile court, though, was not required to

9

credit father's testimony and, birthday pleasantries aside, the court was entitled to rely on the significant evidence of the harm father caused S.B.  Father also asserts that he always tested negative on alcohol and drug tests.  But this merely means that he was not abusing alcohol when he submitted to the tests; the negative results are consistent with S.B.'s report that father is sober during the day and usually "starts drinking at dinner time."  Father highlights his "gainful[] employ[ment]" and lack of "substance-related arrests o[r] convictions."  But his employment or arrests were not at issue in this case—rather, it was his nightly drinking in S.B.'s presence and his resulting aggressive and erratic behavior, which caused S.B. psychological turmoil.  Father also urges that "the juvenile court could have conditioned unmonitored visits on a number of circumstances," such as father and S.B. participating in "conjoint therapy."  This argument ignores the applicable standard of review, under which we have concluded that the juvenile court did not err.  " ' " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' " (*Alexandria M.*, *supra*, 156 Cal.App.4th at p. 1095.)

In view of father's problematic behavior, his repeated refusal to abide by the 2014 joint custody order, the impact of his misbehavior on his daughter, S.B.'s express desire to avoid unmonitored visits with father, and father's complete failure to recognize or address his drinking problem, we cannot conclude that the juvenile court's decision to require monitored visits "exceeded the bounds of reason." (*Alexandria M.*, *supra*, 156 Cal.App.4th at p. 1096.)

10

### *DISPOSITION*

The order is affirmed.


RUBIN, P. J.

WE CONCUR:


MOOR, J.


KIM, J.


11