Filed 12/22/25  In re Grayson F. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re GRAYSON F., <br><br> a Person Coming Under the Juvenile Court Law. | B344985 <br><br> (Los Angeles County Super. Ct. No. 24LJJP00081) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> KAROLINE P., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Jennifer W. Baranoff, Judge Pro Tempore. Affirmed.

Karen B. Stalter, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

—————————————

Karoline P. (Mother) and Justin F. (Father) have a child named Grayson F. (born 2021). In 2024, the juvenile court asserted jurisdiction over Grayson based on domestic violence between the parents, removed the child from parental custody, and ordered reunification services. The sufficiency of the evidence supporting those orders is not disputed. This appeal concerns an order made at the six-month review hearing, on February 6, 2025, that continued the child's out-of-home placement with paternal grandmother. Mother contends the court erred in not returning the minor to her custody at that time because there was insufficient evidence of a continuing risk of detriment to Grayson. For the reasons explained below, we disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

As this appeal involves solely whether substantial evidence supported the court's order continuing an out-of-home placement, we limit our summary of the factual and procedural background accordingly.

## A.    Petition, Adjudication, and Disposition

The Los Angeles County Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code[1] section 300 petition concerning Grayson on March 13, 2024, alleging the child was at risk because of domestic violence between Mother and Father in the child's presence.[2]  DCFS's investigation showed the following facts, among others, in support of jurisdiction.

Mother was arrested in Florida in March 2010 for domestic battery of a relative.  In April 2021, Mother reported to hospital staff that she had a history of anxiety, depression, bipolar disorder, and obsessive-compulsive disorder.  She also told hospital staff she had often smoked marijuana while pregnant with Grayson to cope with mood swings.

The Los Angeles County Sheriff's Department arrested Mother in December 2023 for committing domestic violence against Father.  Father told responding deputies that during an argument over a marijuana pipe, Mother assaulted him with a kick to his chest and by repeatedly hitting his head with her closed fist.  He also said Mother had committed prior acts of domestic violence that he had not reported.  Mother was captured on video by a third-party on a different date stating Father was abusive, had slammed a door on her foot, and that Grayson had "marks" on his body "from [Father] holding him back" from her.

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

[2] DCFS filed an amended petition on April 30, 2024.  As the court later struck the counts added in that amended petition, we do not summarize them.

3

Mother and Father later recanted these statements about domestic violence between them and against Grayson, and denied any such violence.

During an interview, a DCFS investigator observed Mother to be shaking, anxious, paranoid, and speaking rapidly. Despite her 2010 Florida arrest, Mother told DCFS her only arrest had been in December 2023. Mother denied having psychiatric conditions like the ones she previously reported to hospital staff. Witnesses confirmed to DCFS previous reports by Mother of bipolar disorder and of domestic violence between the parents, and said there was ongoing domestic violence between the parents as of May 2024. Paternal great aunt reported Grayson had anger issues and would bite, kick, and punch, and that this was learned behavior from Mother and Father. Paternal grandfather reported that Grayson would sometimes reenact his parents fighting and said to him, " 'Mama and daddy kick.' "

In May 2024, Mother was dismissed from an anger management program in which she had been participating. According to the program's director, Mother was not participating in the program and would not be accepted back into the program because she lacked commitment to treatment objectives. Mother's dismissal letter stated that in addition to her lack of attendance and cooperation in the program, Mother did "not grasp the use of dominance through coercion is unacceptable" and did "not demonstrate positive conflict resolution s[k]ills." (Italics omitted.)

At an adjudication/disposition hearing on July 1, 2024, the dependency court asserted jurisdiction over Grayson based on Mother and Father committing domestic violence against each other in Grayson's presence. As for disposition, the court

4

removed Grayson from parental custody and ordered reunification services. With regard to Mother, these services included attending a 26-week domestic violence program, individual and conjoint counseling, mental health counseling, parenting classes, drug testing, and undergoing an Evidence Code section 730 evaluation (730 evaluation) with a mental health professional.

## B.    The Initial Six Months of Reunification Services

The person initially appointed to conduct the 730 evaluation was unresponsive to DCFS and was eventually replaced. Accordingly, through no fault of Mother, the 730 evaluation did not occur by the time of the six-month review hearing.

During the first six-month reunification period, Mother was largely compliant with ordered services. She completed the 26-week domestic violence program.[3] She participated in the ordered counseling. Her therapist reported that Mother was initially resistant but since October 2024 had actively participated in counseling. Mother's therapist later provided the following statement about the conjoint counseling: "We have three sessions per week consistently. [The parents] do not skip. They understand how fundamental the need for therapy is and they want viscerally to reunify with their son. They do not show any signs of engaging in any inappropriate behavior or regress in terms of any addictive behavior. I can't detect any behaviors that would be a hindrance to provide proper care to their toddler."

---

[3] Mother received court permission to attend more than one domestic violence class per week and, thus, finished the program in less than 26 weeks.

Mother also attended parenting classes.  Mother initially had multiple no-shows for scheduled substance abuse tests reportedly due to her being unaware of the testing process.  Once this issue was remedied, she had 11 continuous negative tests in September and October 2024.

Troubling events, however, also occurred in the six months following the adjudication/disposition hearing.  In July 2024, Mother texted DCFS that Father had "threatened my life again" and that he had "beat [her] up again."  Mother said Father wrapped an item of clothing around her neck and threatened to kill her.  She also accused Father of hitting Grayson hard enough to leave handprints on the child's buttocks.  Later in July 2024, Mother sent a profane and anti-Semitic text to harass paternal great aunt, accusing her of lying that Grayson had aggression issues as paternal great aunt had previously reported to DCFS.

When interacting with DCFS, Mother spoke with such extreme intensity that the social worker repeatedly had to attempt deescalating matters.  Mother said DCFS were "all liars" and insisted her freedom of speech was being infringed.  On August 1, 2024, Mother repeated to DCFS that there was no proof of domestic violence and that any claims to the contrary were all lies.  When asked about her July 2024 text saying Father had assaulted her, Mother stormed out of the room without answering and did not return.  On another occasion, this time in October 2024, Mother told the social worker that Mother "d[i]dn't need [the social worker's] random texts asking silly questions," to "[t]ext me only if necessary," and stating, "I would prefer if you wouldn't speak to us during visits" with Grayson.  Mother also had difficult interactions with the child's caretaker and medical providers in December 2024, saying it was unacceptable for

paternal relatives to have a relationship with Grayson, telling medical staff not to ask Grayson's caregiver (paternal grandmother) any questions when the child was at the hospital because paternal grandmother was " 'just the babysitter,' " and then getting into a verbal altercation with a nurse who tried to calm Mother down.

## C.    The Six-month Review Hearing

The juvenile court held a contested six-month review hearing on February 6, 2025.  Minor's counsel objected to Mother even having unsupervised visits, much less Grayson being returned to her care, saying Mother was not yet "past the hurdle that we could leave her unattended with [Grayson]" because the 730 evaluation had not yet occurred and Mother's continued means of interacting with others remained concerning.  Counsel for DCFS commended the parents for the progress they had made, but objected that it was not yet time to return Grayson to Mother's care because doing so would be detrimental given that there continued to be "very problematic behaviors by Mother that cue us into the fact that Mother has not addressed all of her mental health issues."

Mother's counsel argued Grayson should be returned to Mother's care.  Counsel asserted that the delay in the 730 evaluation was not Mother's fault and indicative that DCFS did not think she had significant mental health issues (otherwise, counsel claimed, DCFS would have expedited that evaluation).  Counsel also argued Mother was complying with her case plan and that there had been no recent reports of domestic violence.

The juvenile court found that returning Grayson to parental custody would create a substantial risk of detriment to the child.  The court noted it had hoped to be able to return

7

Grayson at the review hearing "because both parents have really come very far," but that the evidence compelled a finding that detriment still existed. The court distinguished Mother's behavior from other parents "who[ are] angry because [DCFS] is involved" in their family because Mother's actions were significantly more concerning than that of an irate parent. The court cited from Mother's texts to DCFS and to paternal great aunt as showing "abhorrent behavior and interaction with other people . . . in her son's life," which "is one of the core issues in this case." The court observed that "this case, unlike in other cases, the root of the domestic violence is not just the parents using aggression. It is their perception of the world," as exhibited by "Mother's manic inappropriate aggressive behavior" which had not yet abated to a safe level. The court stated, "I am not returning today" because "I think these things are still being addressed" and a substantial risk of detriment remained. The court ordered continued reunification services and, over the objection of both DCFS and minor's counsel, unmonitored visitation for both parents.

## DISCUSSION

### A.    Standard of Review and Applicable Law

When a court has ordered family reunification services, section 366.21, subdivision (e) mandates a six-month review hearing at which "the court shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (*Id.*, subd. (e)(1).) DCFS bears the burden to establish that detriment. (*Ibid.*) The " 'substantial risk of detriment' "

8

standard is "a fairly high one"; it does not "mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.)

"Detriment can be shown many different ways" (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1059), and the court should consider all admissible, relevant evidence when assessing detriment (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 868). Section 366.21, subdivision (e)(1) requires that in evaluating detriment the juvenile court "shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided." A parent's compliance with her case plan, although important, is not dispositive; the court may find a substantial risk of detriment even if the parent has complied with the reunification case plan. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704.) Whether or not the child is returned to parental custody, "the court shall specify the factual basis for its conclusion that the return would be detrimental or would not be detrimental." (§ 366.21, subd. (e)(2).)

"We review the juvenile court's finding of substantial risk of detriment for substantial evidence, which means evidence that is 'reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case. [Citation.] In the absence of substantial evidence showing such detriment, the court is required to return the minor to parental custody.' " (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.) If substantial evidence supports the

juvenile court's findings, then we have no authority to substitute our judgment for that of the juvenile court, and we must make all legitimate inferences to uphold the appealed-from order.  (*In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1361-1362.)

**B.    The Record Discloses Substantial Evidence of Detriment**

Like the juvenile court, we recognize and applaud Mother's efforts during the first six months of reunification services.  Her compliance started off spotty but had significantly improved by the time of the six-month review hearing.  Mother highlights her improvement over the course of the six months, and argues the court unduly emphasized issues at the beginning of the six-month period to find she still posed a substantial risk of detriment to Grayson if he was returned to her custody.  She further claims that her hostility to DCFS and paternal relatives did not demonstrate a risk of detriment to Grayson.

If one was writing on a blank slate, Mother's contentions would have some force, but we are bound by the standard of review.  "Our role is not to substitute our judgment for that of the juvenile court or reweigh the evidence."  (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1123.)  When more than one inference can reasonably be deduced from the facts in the record, we may not substitute our decision in place of the one made by the juvenile court.  (*Ibid*.)  Here, because substantial evidence supported the juvenile court's determination there was a substantial risk of detriment to Grayson's safety, protection, and physical or emotional well-being if he was returned to Mother's custody as of the time of the six-month review hearing, we must affirm.

The record discloses substantial evidence both that there is a history of domestic violence between the parents, and that this

violence recurred during the first six months of reunification services. Despite participating in services, and hopefully gleaning some insights from those services, Mother continued to deny any domestic violence had ever occurred between her and Father. "One cannot correct a problem one fails to acknowledge" (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197), and the juvenile court was entitled to infer there was still a substantial risk of detriment to Grayson from domestic violence if he was returned to Mother's custody.

Mother's tirades at DCFS and those who cooperated in its investigation buttress the court's finding of a substantial risk of detriment. Mother minimizes these interactions as merely abrasive and indicative of nothing further. But Mother's texts and comments to these persons were not merely abrasive, they were belligerent and meant to harass. This belligerence and harassment was not confined to the beginning of the six-month reunification period at issue; it continued into December 2024, towards the end of that period. The comments made in connection with Mother's dismissal from an anger management program in May 2024 remained true as of the February 6, 2025 finding of detriment at issue: Mother continued to "not grasp the use of dominance through coercion is unacceptable" (italics omitted) and still appeared unable to resolve conflict through means other than aggression. The court could reasonably determine, based on the totality of the evidence before it, that Mother's progress in addressing her volatile anger and resulting potential for violence was still in process and not yet at any level that provided assurance Grayson would not be exposed to a substantial risk of physical and emotional harm if he was returned to Mother's care.

11

## DISPOSITION

The juvenile court's February 6, 2025 order finding a substantial risk of detriment if Grayson was returned to parental custody is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

M. KIM, J.