Filed 4/30/26  In re K.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E086505 |
| Plaintiff and Respondent, | (Super. Ct. No. J304058) |
| v. | OPINION |
| C.P. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant, C.P.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant, J.D.

1

Laura Feingold, County Counsel, and Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendant and appellant, Father C.P. (Father) appeals from jurisdiction and disposition hearing orders and findings, in which the juvenile dependency court found jurisdiction over K.P., and ordered her removed from her parents, Father and K.L.P. (Mother) under Welfare and Institutions Code, sections 300 and 361.[1]

Father contends that plaintiff and respondent, San Bernardino County Children and Family Services (CFS) failed to prove the jurisdiction allegations against him. Father further argues that there was insufficient evidence to support denying him custody of K.P. In addition, Father argues that the juvenile court erred in ordering visitation between K.P. and her stepfather, J.D. (Stepfather).

In a separate appeal of the disposition order, Stepfather contends the juvenile court erred in not finding he was a presumed father of K.P. and denying Stepfather third parent status under Family Code section 7612, subdivision (c).

We find no reversible error and affirm the jurisdiction and disposition orders and findings.

_____

[1] Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

2

## II.

## FACTS AND PROCEDURAL BACKGROUND

Father is K.P.'s noncustodial biological father. He lived with Mother and K.P. until 2015, when K.P. was one and a half, and rarely saw her after that. Father had visitation with her only once during the dependency proceedings. CFS reported that it was apparent from the visitation that there was a bond between K.P., who was 12 years old, and Father.

A. *Juvenile Dependency Petition*

On March 27, 2025, CFS received a referral reporting that Mother was driving drunk with K.P. in the back seat of her car. Her car stalled at the side of the road and she passed out. Someone saw K.P. in the back seat under a blanket crying. When questioned by law enforcement, Mother was uncooperative and refused to provide any information. Mother was charged with driving while under the influence (DUI) and child endangerment. When investigating the incident that day, CPS learned that K.P. is autistic and was living with Mother. Mother's father (MGF) told CFS that Mother was an alcoholic and had completed rehabilitation treatment twice. He had cared for K.P. for about five years early in her life and was willing to care for her if needed. MGF said he had not heard from or seen Father for 10 years.

On April 1, 2025, CFS filed a juvenile dependency petition under section 300, subdivisions (b)(1) and (g). The petition alleged that (1) Mother suffered from serious substance abuse, (2) Mother was arrested for DUI with a child in her vehicle, and child

endangerment, (3) Mother left K.P. without provisions for support, (4) Father failed to protect K.P. from Mother's substance abuse, and (5) Father's whereabouts were unknown.

At the detention hearing on April 2, 2025, the court ordered K.P. detained and placed in MGF's home. During the hearing, Stepfather requested presumed father status for K.P. Mother stated that, although Father was K.P's biological father, Stepfather had treated K.P. as his child since she was six years old. K.P. called him "Daddy." Mother told the court that Father lived with K.P. until she was about a year and a half old. Father saw her after that but it had been years since he had last seen her in 2020. Mother believed he had not visited K.P. because of a restraining order protecting Mother and K.P. against Father.

B. *Jurisdiction/Disposition Report*

When CFS interviewed Mother in April 2025, she admitted the petition substance abuse allegation was true, and said that Stepfather had posted her bail after she was arrested and charged with DUI and child abuse. Mother explained she had been drinking gin because she was coping with her separation from Stepfather. Mother further disclosed that about nine years before (2016), she had been charged with DUI in Wisconsin. K.P. was in her car at that time, as well. Mother had been in three treatment facilities. The first was in 2016, in Victorville, California. She stayed sober for one year. The second one was for 90 days in Pomona. She was transferred to a residential treatment facility and was there for six months in 2019, and then enrolled in a five-month

4

outpatient treatment program. She remained sober for three years, until the recent relapse.

Mother also admitted the domestic violence allegation involving Father. She told CFS that she had been in a domestic violence relationship with Father for five years. During that time, she and Father had more than 30 physical altercations. On one occasion, he poured gasoline on her and tried to set her on fire. On another occasion, he choked her and punched her in the face for no reason. She was hospitalized a couple of times but did not report Father. The last domestic violence incident was in July 2021. Father also had been harassing her by parking his car in front of MGF's home, living out of his car and refusing to leave. On August 21, 2021, the family court issued a restraining order protecting Mother and K.P. from Father based on Mother establishing domestic abuse. The court ordered Father to complete a 52-week batterer intervention program. The restraining expired on August 19, 2024.

Mother told CFS in April 2025 that Father was arrested and in prison in Victorville for assaulting a truck driver. While in prison, he was diagnosed with Post-Traumatic Stress Disorder (PTSD). Mother was currently living with Stepfather, who recently reunified with her. They were trying to work things out and live together. During Father's CFS interview, he reported that, when he heard Mother was arrested, he did not understand why CFS intervened. He had not seen Mother and K.P. since Christmas 2021, although he briefly saw them in May 2024, at Walgreens, and "recently" talked to K.P. after CFS intervened and facilitated a call with her.

5

Father filed for custody of K.P. in 2015. Mother was living in Wisconsin at the time. In June 2015, the family court in Barstow, California, awarded Father joint legal custody of K.P and entered a temporary visitation order granting him in-person and telephonic visits with K.P., who was believed to be in Wisconsin. He did not know Mother's whereabouts until she contacted him and asked him to post bail for her for her DUI in Wisconsin. He posted her bail on the condition she return to California and allow him to have contact with K.P. When Mother returned to California with K.P., Father went back and forth living with Mother and staying in motels. Father told CFS that for the past two years he had been trying to regain custody of K.P. but he had not been able to serve Mother properly.

CFS reported in the jurisdiction/disposition report filed in April 2025, that Father told CFS that Mother falsely claimed she was the victim of Father and Mother's physical and verbal altercations, when she was actually the aggressor. Father denied he poured gasoline onto Mother. He claimed that, because Mother was mad, she poured motor oil in the back of his truck but did not try to set him or his truck on fire. Regarding reports he parked his car outside MGF's home to harass Mother, he conceded he was staying in his car in front of the house, but Mother wanted him to. Because MGF did not like him, Mother had been sneaking Father inside at nighttime or when MGF left.

As to Father's substance abuse, he admitted he used methamphetamine in 2015 until 2018, including with Mother, but said he stopped on his own without participating in a treatment program. He tested negative for controlled substances but positive for

6

marijuana on May 30, 2024. Father did not know if Mother had stopped using methamphetamine but believed she was not addicted to drugs. He never believed K.P. was at risk of harm while in mother's sole care and custody.

CFS filed a supplemental information report on July 10, 2025, stating that Stepfather had not yet participated in predispositional services, such as parenting classes and counseling. He had not provided reasons for not doing so. CFS reported that Mother and Father admitted to their substance abuse issues and to being aware of each other's substance abuse problems. Father acknowledged having a history of drug use and abusing substances over the years. He claimed to be sober, but never participated in treatment. Father had not made himself available for predispositional services and had not enrolled in classes or randomly drug tested, stating that he was "'always in Los Angeles.'" But, as CFS noted, he was flexible when it came to changing visitation scheduling. Although Mother and Father admitted to having a long history of domestic violence, they had not participated in a domestic violence program. Their last incident was in 2024, when Father threatened Mother and Stepfather. Mother and Father accused each other of being the aggressor and at fault.

All of the parents had visited K.P. CFS had no concerns in this regard.

C. *Jurisdiction/Disposition Hearing*

During the jurisdiction/disposition hearing on July 10, 2025, Stepfather testified telephonically, over CFS's objection, that testifying telephonically would interfere with the court's ability to make a meaningful credibility determination. Stepfather requested

presumed father status for K.P. on the grounds he had known her since she was four years old, and lived with her for four years, since she was six years old, until Stepfather's separation from Mother in January 2025.

Stepfather clarified on cross-examination that during the four year period, he lived with K.P. "on and off." He left the home two or three times for a few months during that time. On one occasion, he and Mother separated. On another occasion, he went to prison for nine months because of a probation violation. Stepfather said he called K.P. via video conferencing from prison two or three times a day for 15 or 20 minutes, every day during his nine-month prison term. Stepfather testified he treated K.P. as his biological child and provided for her financially, including providing her with food and shelter. He referred to her as his daughter and she called him "Dad" or "Daddy."

After considering the evidence and hearing testimony and arguments, the court sustained the dependency petition allegations and found jurisdiction over K.P. as a dependent under section 300, subdivision (b). The court ordered K.P. removed from the physical custody of Mother and Father, and found placement of K.P. with Father detrimental to her safety, protection and physical and emotional well-being. The court ordered that K.P. remain in her current placement. The court also denied Stepfather and Mother's request to find that Stepfather was a presumed father of K.P., stating that there was no evidence that denying presumed father status to Stepfather would be detrimental to K.P. However, the court authorized Stepfather to have visitation with K.P., if appropriate.

III.

DOCTRINE OF JUSTICIABILITY

Father contends there was insufficient evidence to support the jurisdiction findings against Father.  Father only disputes the petition allegations against him, arguing on appeal that there was insufficient evidence to support them.  CFS argues that, under the justiciability doctrine, this court may decline to address evidentiary challenges to the jurisdiction findings against Father because Mother did not challenge the jurisdiction allegations and findings against her.

"Pursuant to the doctrine of justiciability, ""[a] judicial tribunal ordinarily may consider and determine only an existing controversy, and not a moot question or abstract proposition.""  [Citation.]  Application of the doctrine of justiciability in the dependency context leads to the conclusion that '[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'  [Citation.]  This is true because no effective relief could be granted in such a situation, as jurisdiction would be established regardless of the appellate court's conclusions with respect to any such additional jurisdictional grounds." (*In re Madison*

*S.* (2017) 15 Cal.App.5th 308, 328-329; see also *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492.)

Father argues that, even though he and Mother admitted the petition allegations against Mother, this court has discretion to decide on the merits whether the trial court erred in finding true the petition allegations against him. Father asks us to review the evidentiary support as to the juvenile court's jurisdictional findings involving *his* conduct. Father recognizes that any decision we might render on the allegations involving Father will not result in a reversal of the court's order asserting jurisdiction. The juvenile court will still be entitled to assert jurisdiction over K.P. based on the unchallenged allegations. (*In re I.A.*, *supra*, 201 Cal.App.4th at p. 1492; see also *In re Christopher M.* (2014) 228 Cal.App.4th 1310, 1316.)

We conclude that Father's challenge to the findings against him are justiciable because the jurisdictional findings may affect whether he is an "'offending parent'" under the Welfare and Institutions Code. The findings also potentially impact his paternal rights and application of the presumption of placement of K.P. with him. Where, here, the jurisdictional findings against Father could have adverse consequences beyond jurisdiction, such as precluding Father from receiving custody or placement of K.P. as a noncustodial parent, this court will exercise its discretion in considering Father's objection to the jurisdiction findings against him. (*In re Christopher M.*, *supra*, 228 Cal.App.4th at pp. 1316-1317; *In re A.R.* (2014) 228 Cal.App.4th 1146, 1150.)

IV.

JURISDICTION ALLEGATIONS AGAINST FATHER

Father challenges the sufficiency of evidence supporting the jurisdiction findings against him. The petition alleges that Father failed to protect K.P. in violation of section 300, subdivision (b). He allegedly "knew or should have known of [Mother's] substance abuse issues and failed to protect [K.P.]" During the jurisdiction/disposition hearing, the court added two new allegations. Father did not object to adding the following two new allegations against him: The father has a substance abuse history, which he has failed to rehabilitate from, and impairs his judgment and ability to care for the minor. The Father's substance abuse history places the minor at substantial risk of physical harm, abuse, or neglect. The father has a history of engaging in domestic violence altercations with the mother. Such conduct by the father places the minor at substantial risk of physical harm, abuse, or neglect.

Father did not testify during the jurisdiction/disposition hearing. Therefore, the only evidence before the court consisted of CFS's reports filed with the court and Stepfather's testimony.

A. *Father's Awareness of Mother's Substance Abuse and His Failure to Protect K.P.*

We conclude there is substantial evidence supporting the true finding that Father knew or should have known of Mother's substance abuse issues and failed to protect K.P. Jurisdiction is proper under section 300, subdivision (b) when a parent fails to supervise

11

or protect their child from the conduct of the custodial parent.  Mother was the sole custodial parent of K.P. when she was removed from her home.  Mother and Father separated in 2015, and Father had not seen K.P. since 2020 or 2021, other than briefly in 2024 and during one supervised visit during the dependency proceedings.

Father admitted he was aware Mother was an alcoholic with a drinking problem and remained in contact with Mother even after issuance of the restraining order against him in 2021.  Father told CFS that in 2015, he posted bail for Mother for her DUI in Wisconsin on the conditions she return to California and allow him to have contact with K.P., Mother complied.  When Mother returned to California with K.P., Father alternated between living with Mother and staying in motels until the domestic violence incident in July 2021, which resulted in the August 2021 restraining order protecting Mother and K.P. against Father.

Father knew Mother abused alcohol.  He told CFS that Mother "'is a violent drunk.'"  He also reported that he had a relationship with Mother for 16 years, and knew she had a drinking problem.  Father stated that he knew she was "'an alcoholic from day one I met her.'"  He said that she was violent, "'especially when she's drunk,'" but only with him, not with the children, and denied the children were at risk of harm with her.  Father said he was also aware Mother had attended various treatment programs and that she had relapsed many times.

Father has not demonstrated that, despite his awareness of Mother's alcoholism and DUIs, he took reasonable measures to protect K.P. He argues that there was a restraining order issued in 2021 against him, which prevented him from doing anything to protect K.P. However, there is evidence that he was not even aware of the restraining order until 2024, when it expired, and he remained in contact with K.P. while the order was in effect. Furthermore, he was not prevented from protecting K.P. after the restraining order expired in August 2024. There is no evidence he did anything to protect K.P., other than attempt to seek custody of K.P. within the last two years. He merely said he was unable to serve Mother. We therefore conclude the court reasonably found that, despite any recent custody attempt within the past two years, Father knew or should have known of Mother's substance abuse issues, yet continued to deny K.P. was or would be at risk of harm from Mother's substance abuse issues, and failed to protect K.P.

B. *Father's Substance Abuse*

Regarding the two jurisdiction allegations added to the petition during the jurisdiction/disposition hearing, we conclude there was sufficient evidence to support the court's true findings. Because there is no evidence that K.P. suffered serious physical harm or illness from Father abusing drugs, the issue is whether the evidence was sufficient to find K.P. was at substantial risk of suffering future serious physical harm or illness. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 764.)

The juvenile court found true the jurisdiction allegation that Father had a substance abuse history, from which he failed to rehabilitate, and which impaired his

13

ability to care for K.P., thereby placing her at substantial risk of physical harm, abuse and neglect. In support of this allegation, there is evidence that Father failed to comply with court-ordered drug testing, other than testing once, which resulted in a negative test result, with the exception of a positive result for marijuana. He also was in denial that Mother had substance abuse.

In addition, CFS reported in a supplemental information report filed on the day of the July 2025 jurisdiction/disposition hearing, that Mother and Father admitted to their substance abuse issues, and Father acknowledged to having a history of drug use and to abusing substances throughout the years, including using methamphetamines in 2017 and 2018. Although Father said that he quit abusing drugs without ever participating in any rehabilitation treatment, he did not make himself available for predispositional services, and his failure to appear for drug testing can be considered the equivalent of a positive test result and hiding his substance abuse problems. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.) Father said he did not enroll in classes or drug test because he was "'always in Los Angeles.'" But, as CFS noted, he was flexible when it came to changing visitation scheduling.

While a history of substance abuse is not a sufficient basis alone upon which dependency jurisdiction can be found (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 764), a parent's substance abuse may present a substantial risk of harm, warranting jurisdiction, when there is past conduct probative of current conditions and an absence of adequate

supervision and care. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 184 [father's abuse of marijuana affected his ability to adequately care for his young children].)

Here, Father tested positive for marijuana, but it is unknown whether his use of marijuana would interfere with his ability to care for K.P. because he had not lived with her for many years. He claims he stopped abusing drugs on his own, such as methamphetamine, several years ago, but he never received substance abuse treatment and he failed to comply with court-ordered random drug testing. Therefore, other than Father's self-serving statements, there is no evidence confirming that Father was completely sober, not likely to relapse, and would safely care for K.P. on his own, unsupervised. Under these circumstances, the court reasonably found that Father's substance abuse history placed K.P. at substantial risk of physical harm, abuse, or neglect if placed in his custody.

C. *Domestic Violence*

The juvenile court found true the allegation that Father had a history of engaging in domestic violence altercations with Mother, which placed K.P. at substantial risk of physical harm, abuse, and neglect. Father's history of domestic violence involving Mother is well documented in the record. Father blames Mother and Mother blames Father for their domestic violence. Regardless of who was to blame, the juvenile court reasonably found that Father's history of domestic violence created a risk of harm to K.P. Even though Father was not living with Mother when K.P. was removed from Mother, the risk of domestic violence in K.P.'s presence remains.

15

Mother and Father's last domestic violence incident was in 2024, when Father threatened Mother and Stepfather. Mother and Father accused each other of being the aggressor and at fault. The most recent reported domestic violence incident before that occurred in July 2021, when Father reportedly poured gasoline on Mother. On another occasion, he choked her and punched her in the face for no reason. The domestic violence incident in July 2021, led to the restraining order against Father to protect Mother and K.P. The court also ordered in August 2021, that Father complete a 52-week batterer intervention program. There is no evidence in the record that Father enrolled in or completed the program, and the restraining order expired in August 2024.

In addition to Father's history of domestic violence with Mother, Father has a criminal history of convictions for violent, dangerous conduct, including two battery convictions in 2015 and 2017, negligent discharge of a weapon, and possession of a firearm. Mother reported in April 2025, that Father was arrested and in prison in Victorville for assaulting a truck driver. And while in prison, he was diagnosed with PTSD. Father confirmed that he had been diagnosed with PTSD while in prison, was prescribed medication for treatment of his PTSD, and was compliant. He reported he stopped mental health treatment when he was released from jail because he no longer needed it.

We conclude there is substantial evidence of Father's history of domestic violence, emotional volatility, and violence, which supports the juvenile court's finding that Father poses a risk of serious harm to K.P., a twelve-year-old autistic girl.

16

V.

DISPOSITION HEARING ORDER

Father contends the disposition hearing order denying him custody of K.P. is not supported by substantial evidence. We disagree.

Section 361.2, subdivision (a), provides: "If a court orders removal of a child pursuant to [s]ection 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of [s]ection 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

This statute "'evinces the legislative preference for placement with the noncustodial parent when safe for the child. [Citation.]' [Citation.] It requires placement with a noncustodial, nonoffending parent who requests custody 'unless the placement would be detrimental to the child.' [Citation.]" (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401.) "The nonoffending parent does not have to prove lack of detriment. Rather, the party opposing placement with a nonoffending parent has the burden to show by clear and convincing evidence that the child will be harmed if the nonoffending parent is given custody. [Citation.]" (*Id.* at p. 1402.) "We review the juvenile court's finding that [the child] would not suffer detriment for substantial evidence." (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1087.)

17

The court in *In re Christopher M.*, *supra*, 228 Cal.App.4th at page 1317, noted that the term, "nonoffending," does not appear in the text of section 361.2, subdivision (a), but some courts nevertheless have recognized "'an implicit nonoffending requirement in section 361.2'" for placement of a child with a noncustodial parent. (See also, *In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1504-1505; *In re C.M.*, *supra*, 232 Cal.App.4th at p. 1401.) The court in *In re Nickolas T.*, *supra*, 217 Cal.App.4th at page 1505, added that "section 361, subdivision (c)(1) states the court may remove the 'offending parent' from the home and allow the 'nonoffending parent' to *retain physical custody* on a showing that he or she can protect the child from future harm. Thus, the term 'nonoffending parent' in section 361 refers to a *custodial parent* who is not the perpetrator of any child abuse or neglect. (Italics added.) It does not refer to a *noncustodial parent* under section 361.2, subdivision (a)."[2]

Section 361, subdivision (c)(1) refers to a child living with both parents, with one of the parents losing custody over the child and removal of the child from that parent's care and custody. That is not the case here. K.P. was living with only Mother when

---

[2] We recognize that there is currently a split of authority as to whether a noncustodial parent must also be a nonoffending parent to be eligible for placement under section 361.2, subdivision (a). (Compare *In re V.F.* (2007) 157 Cal.App.4th 962, 970 ["section 361.2 applies to a noncustodial parent without regard to that parent's status as an offending or nonoffending parent"]; *In re Nickolas T.*, *supra*, 217 Cal.App.4th at p. 1505 ["We are not persuaded . . . [that] . . . a parent must be both 'noncustodial' and 'nonoffending' to be considered for placement under section 361.2"] with *In re A.A.* (2012) 203 Cal.App.4th 597, 608 ["the parent must be *both* a nonoffending *and* noncustodial parent in order to be entitled for consideration under section 361.2"]; *In re John M.* (2013) 217 Cal.App.4th 410, 424-425.)

Mother lost custody over her. K.P. had not lived with Father since 2015. Therefore, section 361.2, subdivision (a) applies. Regardless of whether Father was a "nonoffending" noncustodial parent under section 361.2, subdivision (a), we conclude the juvenile court reasonably found that CFS provided clear and convincing evidence that K.P. would be harmed if placed with Father.

Father argues CFS is barred from arguing for the first time that he was a noncustodial parent under section 361.2, subdivision (a), and therefore not entitled to placement under section 361, subdivision (c), which applies to custodial parents. It is unclear from the reporter's transcript of the disposition hearing whether the court relied on section 361, subdivision (c) or 361.2, subdivision (a) when determining the disposition in this case. Regardless, we conclude that section 361.2, subdivision (a) is the applicable statute as to Father, and we review Father's challenge to the disposition order accordingly.

Even assuming Father was an "offending party" and the juvenile court was required to place K.P. with Father unless it found that placement with him would be detrimental to K.P., there was substantial evidence such placement would be detrimental to her "safety, protection, or physical or emotional well-being." (§ 361.2, subd. (a).) Therefore, the juvenile court did not err in denying placement of K.P. with Father, and it is not reasonably probable that the disposition would have been any different had the court not found true the jurisdiction findings against Father. (*In re J.P.* (2017) 15 Cal.App.5th 789, 799-800.) There was substantial evidence that Father had a history of

unresolved substance abuse and noncompliance with court-ordered drug testing, a history of domestic violence with Mother, failure to complete a court-ordered 52-week domestic violence program, and failure to protect K.P. from Mother's neglect. There was also evidence of Father not treating his diagnosed PTSD, and he was suffering from emotional volatility and committing acts of violence. In addition, Father had very little contact with K.P. for many years.

## VI.

## VISITATION ORDER

Father contends the juvenile court abused its discretion by granting Stepfather visitation with K.P. Father argues that Stepfather had no inherent right to visits with K.P. under section 361.5, subdivision (a), because he is not a biological Father, the juvenile court denied him presumed parent status, and there was no evidence of detriment from denying Stepfather visitation.

Section 361.5, subdivision (a) provides in relevant part: "whenever a child is removed from a parent's or guardian's custody, the juvenile court *shall order* the social worker to provide child welfare services *to the child and the child's mother and statutorily presumed father* or guardians." (Italics added.) Rule of Court, rule 5.695(f)(3) states that, "[i]f a child is removed from the custody of *a parent* or guardian, and reunification services are ordered, the court *must order visitation between the child and the parent* or guardian for whom services are ordered. Visits are to be as frequent as possible, consistent with the well-being of the child. (Italics added.)

During the disposition hearing on July 10, 2025, the juvenile court granted Stepfather visitation with K.P., noting that the court had discretion to find K.P. had more than two parents and that Stepfather could be deemed a third parent. (See Fam. Code, § 7612, subd. (c).) The court further noted that there was evidence that Stepfather had "great positive interaction" with K.P., but there was no evidence of detriment in denying him presumed parent status or third parent status. Nevertheless, the court found that allowing Stepfather visitation with K.P. was appropriate on the condition there would be "no parent alienation" towards Father. The court clarified that such visitation was not ordered; it was "allowed" so long as appropriate, and would stop if Stepfather attempted to alienate K.P. from Father.

Father argues that, even though the court had discretion to permit an interested person, such as Stepfather, to have visitation, no visitation should have been ordered because it was detrimental to K.P.'s well-being. Father further argues that granting Stepfather visitation with K.P. was an abuse of discretion because Father objected to it, Stepfather was merely an alleged father and of no relation to K.P., and the court denied Stepfather presumed father status. In addition, Father argues that visitation should have been denied because K.P. accused Stepfather of sexually abusing her. But Father acknowledges that CFS investigated the accusation and concluded there was no evidence supporting it.

Father has failed to demonstrate that K.P.'s visitation with Stepfather would be detrimental to her, and he acknowledges that CFS reported K.P. was happy to see

21

Stepfather when he visited her. We conclude that, even though Stepfather was not a biological parent or presumed parent, the juvenile court had authority to order visitation between Stepfather and K.P. (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1118 (*J.P.*).) The visitation order allowing Stepfather to visit K.P. falls within the scope of section 362, subdivision (a), "which grants the juvenile court considerably broad authority to 'make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the [dependent] child, including medical treatment, subject to further order of the court.' Section 362, subdivision (d) also provides that '[t]he juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . . .'" (*J.P.*, *supra*, 37 Cal.App.5th at p. 1118.)

"[T]here are only two statutes that expressly discuss visitation orders made during ongoing dependency proceedings. First, the juvenile court must order visitation with parents and siblings subject to certain exceptions if the child is placed in foster care. (§ 362.1, subd. (a)(1)(A), (a)(2).) Second, the juvenile court must consider ordering visitation with grandparents if the child is removed from the parents' physical custody if 'the best interest of the child' will be served by doing so. (§ 361.2, subd. (i).) However, simply because the statutory scheme *requires* the juvenile court to order visitation with parents and siblings in certain circumstances unless applicable exceptions apply and *requires* the juvenile court to consider grandparent visitation does not mean that ordering

visitation with other interested individuals is not permitted." (*J.P.*, *supra*, 37 Cal.App.5th at p. 1118.)

As concluded in *J.P.*, *supra*, 37 Cal.App.5th at page 1118, Stepfather might not have the statutory right to visitation, but there is nothing precluding the juvenile court from ordering visitation if it is reasonably related to the child's care and is in the child's best interest. (See also *In re Hirenia C.* (1993) 18 Cal.App.4th 504, 510 [a person whose relationship with child did not rise to level of de facto parenthood has standing to bring petition requesting visitation rights with child if facts establish that the person has "an interest" in child as defined under § 388].) (*J.P.*, *supra*, 37 Cal.App.5th at p. 1118.)

As the court in *J.P.*, *supra*, 37 Cal.App.5th at page 1119, explains, "Permitting the juvenile court to order visitation with nonparents if such visitation is in the child's best interest also promotes the overarching purpose of the dependency system, which is to ""'maximize a child's opportunity to develop into a stable, well-adjusted adult.'""" [Citation.] 'The best interest of the child is the fundamental goal of the juvenile dependency system . . . .' [Citation.] The juvenile court has the special responsibility to consider the totality of a child's circumstances, 'including the maintenance of relationships with other adults with whom [the child has] a strong bond.' [Citation.] If the evidence presented to the juvenile court establishes that it is in the child's best interest to facilitate visitation, such an order may be permissible."

In a footnote, the *J.P.* court adds: "As the Department observes, these types of visitation orders would also be consistent with the statutory requirements that a juvenile

court must ensure that child welfare agencies make reasonable efforts to maintain relationships between older dependent children and 'individuals other than the child's siblings who are important to the child' if the dependent child is placed in foster care. (§ 366, subd. (a)(1)(B).) The inclusion of individuals that are important to the child—a broad category that includes nonrelatives—in the dependency scheme suggests that juvenile courts may order visitation between older dependent children and important individuals to maintain these relationships. . . . '[W]eighing the best interests of the dependent child is always the court's paramount concern.' [Citation.]" (*J.P.*, *supra*, 37 Cal.App.5th at p. 1119, fn. 3.)

Here, there was evidence that K.P. had a close relationship with Stepfather which developed during the time he lived with her and Mother on and off for four years. During the detention hearing, Mother stated that, although Father was K.P.'s biological father, Stepfather had treated K.P. as his child since she was six years old. K.P. called him "Daddy." During the jurisdiction/disposition hearing, Stepfather requested presumed father status for K.P. on the grounds he had known her since she was four years old and lived with her on and off since she was six years old. In addition, he said he called K.P. via video conferencing from prison two or three times a day for 15 or 20 minutes, every day during his nine-month prison term. Stepfather testified he treated K.P. as his biological child and provided for her financially, including providing her with food and shelter. He referred to her as his daughter and she called him "Dad" or "Daddy." In addition, CFS reported that on April 17, 2025, CFS observed that K.P. "became emotional

24

upon seeing [Stepfather]." K.P. reportedly "ran up to him, hugged him, and asked to visit with him."

Father understandably expresses concern about K.P.'s statement that Stepfather sexually abused her, but CFS and the juvenile court reasonably found that, under the circumstances in which it was made, the accusation lacked credibility and there was no evidence substantiating it as true. CFS reported that K.P. "never vocalized that someone was sexually inappropriate with her, and she simply nodded yes to the question (from the questionnaire) asked by the caregiver. It is unknown if the child fully understood the question as she is diagnosed with autism. It is also unknown how the caretaker inquired about this matter. However, based on the evidence, the referral will be closed with unfounded allegations."

We conclude, based on the totality of the evidence, that the juvenile court did not abuse its discretion in authorizing visitation between Stepfather and K.P.

VII.

STEPFATHER'S APPEAL

Stepfather contends the juvenile court erred by finding K.P. would not suffer detriment from the court denying him presumed father status and third parent status under Family Code section 7612, subdivision (c).

A. *General Principles*

"Dependency law recognizes three types of fathers: presumed, alleged and biological. [Citations.] [¶] . . . A presumed father is one who meets one or more

specified criteria listed in [Family Code] section 7611 . . . . [Citation.] [Family Code] [s]ection 7611 sets forth a number of rebuttable presumptions of paternity, mostly concerned with various forms of marriage or attempted marriage to the child's mother. [Citation.] 'The statutory purpose [of [Family Code] section 7611] is to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.'" (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1208-1209.)

Family Code section 7611, subdivision (d) provides presumed parent status if "[t]he presumed parent receives the child into their home and openly holds out the child as their natural child." A person requesting presumed parent status under Family Code section 7611, subdivision (d) must have a "*fully developed parental relationship*" with the child. (*R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 776; *In re M.Z.* (2016) 5 Cal.App.5th 53, 63 (*M.Z.*).) "A 'caretaking role and/or romantic involvement with a child's parent' is not enough to qualify. [Citation.] A presumed parent must demonstrate "'a full commitment to [parental] responsibilities–emotional, financial, and otherwise.'" [Citation.] 'The critical distinction is not the living situation but whether a parent-child relationship has been established. "'[T]he premise behind the category of presumed [parent] is that an individual . . . has demonstrated a commitment to the child and the child's welfare.'" [Citation.] 'One who claims he [or she] is entitled to presumed [parent] status has the burden of establishing, by a preponderance of the evidence, the

facts supporting that entitlement.'" (*M.Z.*, *supra*, at pp. 63-64; *In re T.R.*, *supra*, 132 Cal.App.4th at p. 1210.)

With regard to third parent status, "[a]s a general rule, '"there can be only one presumed father."' [Citation.]" However, "the Legislature enacted [Family Code] section 7612, subdivision (c) to allow courts to recognize that a child has more than two parents in certain limited contexts: '*In an appropriate action*, a court may find that more than two persons with a claim to parentage under this division are parents *if the court finds that recognizing only two parents would be detrimental to the child.* In determining detriment to the child, the court shall consider all relevant factors, including, but not limited to, the harm of removing the child from a stable placement with a parent who has fulfilled the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time. A finding of detriment to the child does not require a finding of unfitness of any of the parents or persons with a claim to parentage.' (Fam. Code, § 7612, subd. (c), italics[] added by Stats. 2013, ch. 564, § 6.5.) . . . [Family Code] section 7612, subdivision (c) allows a court to recognize three parents only in 'rare cases' where a child truly has more than two parents." (*In re Donovan L.* (2016) 244 Cal.App.4th 1075, 1086-1087; *M.Z.*, *supra*, 5 Cal.App.5th at p. 64.)

On appeal, we independently interpret statutes but review factual findings regarding parentage under Family Code section 7611 or section 7612 for substantial evidence. (*M.Z.*, *supra*, 5 Cal.App.5th at p. 64.) If there is substantial evidence to

27

support a factual ruling, "'it will not be disturbed on appeal even if the record can also support a different ruling.'" (*Ibid*.)

B. *Discussion*

We first address CFS's contention the juvenile court erred in failing to make a finding that Stepfather qualified as a presumed father under Family Code section 7611, subdivision (d) and denying Stepfather third parent status under Family Code section 7612, subdivision (c).

After finding jurisdiction over K.P. and proceeding with the disposition hearing, the court stated: "I'm aware I can thwart any prior orders from family law court—I'm not going to do that—related to presumption. Then that brings me to—notwithstanding the very violent past. That brings me to the two presumed parents. For me to find that, I have to find that it would be detrimental to the child when I recognize two parents. I have great positive interaction, and I have testimony, but I don't have evidence of detriment. So I'm not going to find that. Because I have no evidence that it would be detrimental. But I will allow [Stepfather] to have visits with [K.P.] if appropriate. And then—but no parent alienation is to happen towards the other parent. If that occurs, he is done. . . . He can't disparage or try to undermine the relationship between [Father] and his daughter."

This statement of the court's reasons and rulings on Stepfather's requests for presumed father status and third parent status as to K.P. is ambiguous. The juvenile court noted that the family law court previously found that Stepfather was a presumed father,

28

but acknowledged that it was not bound by that family law court ruling and had discretion to find otherwise. The juvenile court indicated that it was not going to contradict the family law court order but made no express finding or ruling on Father's presumed father status. The jurisdiction/disposition minute order does not state that the juvenile court made any finding as to whether Stepfather was the presumed father of K.P.

Because there was no request for clarification on whether the juvenile court found Stepfather was a presumed father and the court made no express finding, Stepfather forfeited any objection to the court not ruling on his request for presumed father status as to K.P. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222.)

The court's statement as to third parent status under Family Code section 7612, subdivision (c) is also somewhat ambiguous and confusing, but it is sufficiently clear that the juvenile court denied Stepfather third parent status. While the juvenile court stated that there could be "two presumed parents," this can be reasonably construed as the court referring to Father and Stepfather. The juvenile court found Father was K.P.'s presumed father and acknowledged that the family law court previously found Stepfather was also her presumed father, and the juvenile court indicated it was not going to contradict that finding. The juvenile court stated that it did not find detriment to K.P. and therefore it was not going to find two presumed parents (Father and Stepfather), but would nevertheless allow Stepfather to have visitation with K.P.

Regardless of whether Stepfather was a presumed father, it is clear from the court's statements that the juvenile court reasonably found that Stepfather did not qualify

29

for third party status under Family Code section 7611 because there was no showing of detriment. Family Code section 7612, subdivision (c) applies when "there is an *existing* parent-child relationship between the child and the putative third parent, such that 'recognizing only two parents would be detrimental to the child.'" (*In re Donovan L.*, *supra*, 244 Cal.App.4th at pp. 1090-1091; *M.Z.*, *supra*, 5 Cal.App.5th at p. 65.)

Here, there is substantial evidence supporting the juvenile court's denial of putative third parent under Family Code section 7612, subdivision (c) based on insufficient evidence of detriment. Stepfather failed to demonstrate that his parent-child relationship with K.P. was such that recognizing only two parents (Mother and Father) would be detrimental to K.P. Stepfather testified he lived with Mother and K.P. for four years, minus two or three times when he separated from Mother for a few months. He also did not live with Mother and K.P. while he was in incarcerated for nine months. In addition, he was not living with Mother and K.P. at the time of Mother's arrest for the DUI that led to K.P.'s removal from Mother in March 2025, and was not living with Mother at the time of the jurisdiction/disposition hearing.

Even though Stepfather reportedly maintained contact with K.P., treated her as his own daughter, and had a close relationship with her, the trial court reasonably denied Stepfather third parent status because he did not have a consistent presence in K.P.'s life, and it was unlikely he would have a consistent presence in the future because of his sporadic, unstable living situation and relationship with Mother.

## VIII.

## DISPOSITION

The juvenile court's jurisdiction and disposition findings and orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON _____

J.

We concur:

MILLER _____

Acting P. J.

RAPHAEL _____

J.